Ehrlich, Appellant, *v.* United States Fidelity and Guaranty Company.

418

Argued December 2, 1946. Before Maxey, C. J., Drew, Linn, Stern, Patterson, Stearne and Jones, JJ.

*Ira Jewell Williams*, with him *Marshall M. Cohen*, *William H. Peace, 2nd*, and *White & Williams*, for appellant.

*F. Lyman Windolph*, for appellee.

OPINION BY MR. JUSTICE JONES, March 29, 1947:

This is an appeal from a judgment of nonsuit in an action of assumpsit upon a policy of public liability insurance issued by the defendant company to J. C. Ehrlich, the plaintiff. The policy insured the holder against liability to others, under specified circumstances and conditions, for injuries or death resulting from the operation of the insured's fumigating business. The suit was brought by the insured in an effort to recoup from the defendant company the amount of damages and expenses incidental thereto which he had been required to pay in an action of trespass for the death of an infant upon a liability which the plaintiff claims was covered by the policy. At the conclusion of the plaintiff's case, the learned trial judge entered the compulsory nonsuit (here involved), which the court en banc subsequently refused to take off, on the ground that the testimony adduced by the plaintiff conclusively convicted him of breaching certain of his express warranties contained in a "Co-operation Endorsement" or rider to the policy in suit.

On the morning of December 7, 1943, the plaintiff's representative and a helper began the fumigation of a three-story brick dwelling house in the city of Lancaster, using for that purpose hydrocyanic gas which is

slightly lighter than air and highly lethal in nature. The first and third floors of the dwelling were occupied by the owner of the property, Mrs. Helen Stathopulos, and her family. Mrs. Ruth Binkley with her eighteen months old son, a normal child in good health, occupied the second floor as tenant. The fumigation was begun about 8 A. M., and all of the occupants of the house, upon warning previously given, had left the premises prior thereto.

The fumigator, together with his helper, having performed all of the things necessary to the undertaking in hand, left the premises sealed up around 10 A. M. that morning. They returned about 5 P. M. that afternoon for the purpose of opening the building to ventilation. The fumigator first entered the house with a gas mask, doing no more upon that entrance than opening the doors and windows. The house was one in a compact row of buildings, being flanked on either side by a structure and, as a consequence, there was no cross draft in the dwelling under fumigation. After a time, the fumigator re-entered the house, gathered up the materials used in his work and disposed of them by burning in the back yard. He conducted a separate chemical test on each of the three floors of the dwelling for the presence of hydrocyanic gas. The test made on the second floor (Mrs. Binkley's apartment) and the one made on the third floor each produced a negative reaction. However, the test on the first floor, which was made on a studio couch, disclosed the presence there of hydrocyanic gas in a deadly quantity. There were twenty-five cubic feet of the gas per million cubic feet of air while, according to the plaintiff's chief witness, the maximum tolerance of a human being for hydrocyanic gas is a mixture containing not more than ten cubic feet of the gas to a million cubic feet of air.[1] No

---

[1.] Alexander Ehrlich, the plaintiff's nephew, the actual fumigator in this instance and the only witness on the matter of gas, testified in direct examination as follows:

chemical tests of the premises other than the three above-mentioned were ever made.

The fumigator quit the premises at approximately 7 P. M., leaving the windows of the house open and the doors locked. He did not again return. It was his expressed idea that "it [could] be safely presumed that these 25 per million will dissipate during that 12-hour period [i. e., until the authorized return of the occupants the next morning]". After the house had been opened to ventilation, the fumigator was able to, and did, go into the building without the protection of a gas mask between 6 and 7 P. M. But, during the whole of the period (5 to 7 P. M.) the helper did not enter the house but remained outside. Later the same evening (around 9 P. M.) the fumigator returned the keys to the house to Mrs. Stathopulos at her place of business in another part of the city and instructed her to beat the overstuffed furniture and bedding near a window when she re-entered the dwelling.

Early the next morning (December 8th), one of Mrs. Stathopulos's adult daughters (Mrs. Bessie Wasenda) visited the house for a short while merely to close some of the windows and check the furnace. She re-entered the house for occupancy about 5 o'clock that afternoon,

---

"Q. Based upon your experience over the period of years what is the *maximum* amount of hydro-cyanic gas that a human being can tolerate without getting sick?

\* \* \* \*

"A. The *maximum* amount is ten per million.

"Q. Ten cubic feet?

"A. It would be ten cubic feet in one million feet of air." (Emphasis supplied) (R. 91a)

In cross examination, the same witness testified with respect to the twenty-five feet of gas per million cubic feet of air found in the piece of upholstered furniture on the first floor, as follows:

"Q. Your opinion is it was 25 parts in a million?

"A. That would have been a maximum.

"Q. Which is higher, if I understood you, than the maximum amount to which you testified a moment ago could be *endured by a person with safety?*

"A. That is right." (Emphasis supplied) (R. 95a)

the rest of the family coming back between 5 and 6 P. M. Later that evening, Mrs. Wasenda beat some of the pillows, mattresses and bedding in the Stathopulos' quarters. There is no evidence, however, that the studio couch on the first floor, which had shown a positive reaction when tested by the fumigator, was beaten.

Mrs. Binkley returned with her son to her apartment around 6 P. M. the same day (December 8th). She beat her mattresses, pillows and bedding and cleaned up the apartment in general. But, here, likewise, there is no evidence that the sofa in Mrs. Binkley's apartment was beaten. She and her son slept in the apartment that night. The child was fussy and slept fitfully. Between 5:30 and 6 o'clock the next morning (December 9th) the child died from the effects of hydrocyanic gas poisoning as was conclusively established by an autopsy.

As already indicated, the "Co-operation Endorsement" or rider to the policy contained six express warranties on the part of the insured. To the presence thereof as an integral part of the policy, the insured attested his actual knowledge by signing his name on the rider at the end of the warranties. Such of the warranties as are presently material read as follows:

"5. Minimum temperature of 60° Fahrenheit will be maintained during ventilation and all overstuffed material including, but not limited to, furniture and bedding will be beaten and adequate chemical or other test for the presence of gas will be made before allowing any person their use.

"6. No person will be permitted to enter the fumigated premise before the fumigator has satisfied himself by adequate chemical or other test and by personal inspection, without gas mask or other means of protection, of every part of the fumigated premises, that it is safe for human occupancy."

No question of the fumigator's liability for the child's death is here involved. All that is raised on this appeal is whether or not the plaintiff made out a case against

the insurance company under the contract in the light of the above-quoted warranties and the testimony adduced at trial. Certainly, there were no issues of fact for a jury to resolve. Nor is there any occasion for resort to the familiar rule of construction that an insurance policy is to be construed most strongly against the insurer. That rule, like corresponding artificial aids for the ascertainment of intent, becomes germane only when the meaning of the writing in action is doubtful, uncertain or ambiguous. It has no proper role in the interpretation of a writing which is clear and unmistakable,—a circumstance primarily for a court to ascertain and declare in any case. To relieve the plaintiff, by a rule of construction, from his deliberate contractual undertakings would be tantamount to abandoning the judicial function of interpreting written agreements according to the ordinary meaning of their plain words.

What we *are* required to do in the present instance, because of the existent procedural situation, is to view the evidence received at trial, and any improperly excluded, as well as the reasonable inferences therefrom, on the basis most favorable to the plaintiff (*Kimble v. Wilson*, 352 Pa. 275, 277, 42 A. 2d 526), bearing in mind that a nonsuit may be entered only in a clear case and that, where there is any doubt as to the inferences to be drawn from the evidence, the case is for the jury (*Rhoads v. Herbert*, 298 Pa. 522, 524, 148 A. 693). So doing, it is our opinion that the action taken by the learned court below was appropriate to the circumstances.

The appellant contends, however, that the entry of the nonsuit and the refusal to take it off were error for two reasons, viz., (1) the plaintiff's warranties being promises with respect to matters subsequent, any alleged violations thereof constitute substantive defenses which it is the defendant's burden to prove affirmatively and (2) in any event, the evidence justifies a finding of substantial compliance by the plaintiff with his warranties.

The authorities, which the appellant cites on the question of burden of proof, are peculiarly apt: e. g., 8 Couch on Insurance, § 2218, p. 7182; *Zenner v. Goetz,* 324 Pa. 432, 435, 188 A. 124; *Donaldson v. Farm Bureau Automobile Insurance Company,* 339 Pa. 106, 108, 14 A. 2d 117; *Goldenberg v. Equitable Life Assurance Society,* 113 Pa. Superior Ct. 414, 420, 173 A. 445. We have no quarrel with the merit of those citations. But, the question to which they are pertinent is not present on the record now before us. The case was pleaded by the plaintiff and, likewise, tried on the theory that it was incumbent upon him to prove, as a part of his case, his compliance with his warranties relative to the risk. The appellant concedes as much. In his "Statement of Questions Involved", he poses that the ". . . insured showed in his case in chief (although not obliged to do so) absolute compliance with five out of six of such provisions [i. e., warranties] . . .". Assuming, therefore, that all the plaintiff needed to do was to prove a liability upon him which was within the insuring clause of the policy and free of any breach of his warranties, what he in fact did was to prove affirmatively his failure to comply with his warranties in several material particulars. That being so, he is without just cause for complaint on that score. When the existence of facts constituting an affirmative defense are admitted by a plaintiff or are established by uncontradicted testimony in the plaintiff's case with such conclusiveness as to exclude the reasonable possibility of an inference otherwise, a nonsuit is proper: see *Kilpatrick v. Philadelphia Rapid Transit Co.,* 290 Pa. 288, 292-293, 138 A. 830; *March v. Traction Company,* 209 Pa. 46, 47, 57 A. 1131; *Winner v. Oakland Township,* 158 Pa. 405, 409-410, 27 A. 1110; *Hause v. Lehigh Valley Transit Company,* 38 Pa. Superior Ct. 614, 619; cf. also *Whitman v. Pennsylvania R. R.,* 156 Pa. 175, 178, 27 A. 290.

The lower court justified the nonsuit in the instant case on the ground that the insured had breached the

warranties of paragraph 5 of the rider, relating to the beating of overstuffed material (including furniture and bedding) and to the chemical or other test for the presence of gas, both of which functions were to be performed (following the fumigation) before any person was allowed the use of such furnishings. The plaintiff replies that there is not a word of testimony that his representative did not beat the specified materials, and, hence, no inference from the evidence that he did not do so can possibly be treated as conclusive. Conceding the merit of that position in the first instance, the evidence which the plaintiff actually produced at trial so exhausted the field of inquiry with respect to the beating of the furnishings, after the fumigation, as to render inadmissible an inference that the plaintiff's representative had beaten or had supervised the beating of the overstuffed materials (including furniture and bedding). So much is readily apparent.

The plaintiff called as witnesses his fumigator and the latter's helper. They testified fully as to what they had done during the two-hour period they were at the house after opening it to ventilation at 5 P. M. But, not once did either of them intimate that the overstuffed material, including furniture and bedding, had been beaten by them or by anyone else. At the same time, it is perfectly plain from their testimony that, while they were on the premises following the fumigation, the house was still too saturated with the deadly gas to permit of work in the interior as time-consuming as beating heavily upholstered furniture and bedding. In fact, the helper did not even go into the house during the whole of that two-hour post-fumigation period. The fumigator, himself, did enter but only for intermittent brief periods. And, although his own testimony shows that he well knew the lurking danger from "sealed in" gas pockets, particularly in the upholstering and bedding, he left entirely to others for a later time the matter of beating any residual gas into the open for harmless dissemina-

tion. The first mention that the furnishings should be beaten was contained in the fumigator's instructions to Mrs. Stathopulos upon delivering to her the keys to the house at her place of business at 9 o'clock that night; and, what he then told her "concerned the behavior of tenants after coming back [i. e., twelve hours later] in respect to cleaning or beating the mattresses and over-stuffed furniture of any kind, in order to eliminate the possibility of gas being sealed in such pieces of furniture". For some unexplained reason, Mrs. Stathopulos was not called as a witness, but it will be inferred in the plaintiff's favor that Mrs. Stathopulos informed her daughter, Mrs. Wasenda, of the fumigator's instructions. According to Mrs. Binkley, the daughter told her of the directions. Certain it is, however, that neither the plaintiff nor any representative of his had any first-hand knowledge at any time as to whether the material in question had been beaten. Indeed, the fact is that, notwithstanding the plaintiff's assumption to prove compliance with his warranties, he produced no testimony that either the studio couch on the first floor, which, upon chemical test, had been shown to be permeated with gas of deadly quality, or the sofa in Mrs. Binkley's apartment had been beaten by anyone.

In the circumstances thus disclosed by the evidence in the plaintiff's case, it would be but an exhibition of caprice and perversity for a jury to infer that the plaintiff had not breached his warranty with respect to the beating of the furniture, etc. There was no issue of fact in material connection which called for submission to the jury. What was said in *Virgilio v. Walker and Brehm*, 254 Pa. 241, 244-245, 98 A. 815, is especially apposite here, viz., ". . . a nonsuit can be entered . . . when it is inconceivable, on any reasonable hypothesis, that a mind desiring solely to reach a just and proper conclusion in accordance with the relevant governing principles of law, after viewing the evidence in the light

most advantageous to the plaintiff, could determine in his favor the controlling issues involved".

As the warranty with respect to the beating of the furnishings was a responsibility of the insured which he could not pass on to others, so also was it his responsibility under paragraph 5 of the rider to make "adequate chemical or other test for the presence of gas . . . before allowing any person [the] use" of the furniture, bedding, etc., in the fumigated house. The knowledge and experience which fulfillment of the latter warranty called for made it peculiarly a type of obligation which the warrantor could neither delegate nor evade. The two matters conjointly so warranted in the fifth paragraph of the rider, i. e., the beating of the furnishings and the performance of an adequate chemical test thereon, relate to one thing and are directed to the same end, viz., the time and the circumstance of allowing personal use of furniture, etc., following a fumigation. In apparent recognition of the latter warranty the fumigator, as already noted, made a chemical test for the presence of gas on a piece of upholstered furniture on each of the three floors of the dwelling and thereby detected in the studio couch on the first floor the presence of gas in a quantity two and a half times greater than can safely be tolerated by a human being. Yet, all the fumigator did about that was to presume "that these 25 per million [would] dissipate during [the] 12-hour period" before the occupants' return which he was ready to, and did, authorize. Of course, the fumigator could not discharge his express warranty by any such facile assumption. And, again, on the basis of the facts which the insured himself adduced at trial, he is conclusively to be held to have breached his warranty. The fact that there is no direct causal relation between the gas found in the studio couch on the first floor and the death of the child is wholly without bearing upon whether the plaintiff breached his covenants. This is

not an action in trespass based upon negligence but an action of assumpsit founded on a contract.

We agree with the appellee's further contention that the plaintiff also breached the warranty contained in paragraph 6 of the rider. While this point was not passed upon by the court below, it furnishes an additional reason for our affirmance of the judgment appealed from. In paragraph 6 the insured warranted that no person would be permitted to enter the fumigated premises before the fumigator had satisfied himself "by adequate chemical or other test *and by personal inspection* . . . of every part of the fumigated premises, that it [was] safe for human occupancy". (Emphasis supplied.) The evidence in the case leaves no doubt that the fumigator did not take adequate steps to so inform himself before authorizing the return of the dwelling's occupants. He did, it is true, perform chemical tests upon furniture on the three floors of the house and found gas in alarming proportions in the studio couch on the first floor. Yet, he did nothing thereafter to determine whether gas in harmful quantity was still present in the house. Rather, he contented himself with an unjustifiable assumption that all the gas in the house had been dissipated and that none would remain sealed up in upholstery or bedding after twelve hours. That assumption was the more flagrant in view of the facts that, because of the relatively short duration of the fumigation, the quantity of gas released in the operation had been intentionally increased over the amount normally used; and the house was without a cross draft.

Nor is it of any avail to the insured to assert that the fumigator had satisfied himself that the premises were safe for human occupancy. Manifestly, he did not so ascertain by any personal inspection of the premises up until he departed therefrom for the last time at 7 P. M. on the day of the fumigation. It is equally certain that he did not otherwise satisfy himself of the safety of the premises when the occupants were permitted to

return. While it was the fumigator who was to be satisfied as to the safety of the premises, his mere profession of such satisfaction was not legally sufficient. Where the satisfaction of a party is, by contract, made the standard of acceptable performance, the satisfaction must be real and genuine and not prompted by caprice or bad faith or for the purpose of evading an obligation or duty: see *Lippincott v. Warren Apartment Co.,* 307 Pa. 320, 325, 161 A. 330; *Jessup & Moore Paper Co. v. Bryant Paper Co.,* 283 Pa. 434, 439, 129 A. 559; *Bolton v. Central Trust & Savings Company,* 42 Pa. Superior Ct. 605, 607. The satisfaction meant by the warranty is such as would reasonably flow from the fumigator's *bona fide* perception of a factual condition and not from his own peculiar state of mind.

The appellant further argues that his representative substantially performed the undertakings of the warranties. The contention is without merit. As we have already seen, the fumigator did nothing in the way of attending to the beating of the furnishings or making the required personal inspection of the fumigated premises. There is therefore no basis for a claim of substantial performance. One must make an honest, conscientious effort to perform an obligation or requirement before he can assert that his performance was substantial. "The equitable doctrine of substantial performance is intended for the protection and relief of those who have faithfully and honestly endeavored to perform their contracts in all material and substantial particulars, so that their right . . . may not be forfeited by reason of mere technical, inadvertent, or unimportant omissions or defects. It is incumbent on him who invokes its protection to present a case in which there has been no wilful omission or departure from the terms of his contract. If he fails to do so, the question of substantial performance should not be submitted to the jury": *Gillespie Tool Co. v. Wilson,* 123 Pa. 19, 26, 16 A. 36, quoted from with approval in *Morgan v. Gamble,* 230 Pa. 165,

175, 79 A. 410, and *Sgarlat v. Griffith,* 349 Pa. 42, 46, 36 A. 2d 330. The case of *J. B. Liebman & Co., Inc. v. Aetna Casualty and Surety Co.,* 124 Pa. Superior Ct. 69, 188 A. 100, cited by the appellant, is readily distinguishable from the present on the ground just indicated. In the *Liebman* case, unlike here, the insured took definite, positive steps looking to the fulfillment of his covenants. The facts as to what the fumigator in this case did are not in dispute. In any view, therefore, the question of substantial performance was one of law for the court whose ruling we approve.

Judgment affirmed.

---

CONCURRING OPINION BY MR. CHIEF JUSTICE MAXEY:

I concur in the majority opinion and now state my reasons for rejecting the argument against it. It is asserted that "If the majority opinion is correct, the plaintiff has been paying . . . for a . . . policy not worth the paper on which it is written." It is asked and argued: "For what purpose does a person take out such a policy? . . . If he were always so careful as to avoid the likelihood of accident he would have no use for liability insurance, because, even if a third person were injured, unless such injury was due to negligence on the part of the insured the latter would not be liable to the injured person and would therefore have no need for insurance. . . . if the fumigator had to measure up to such a standard in order to recover on his policy there would never be any need for him to have a policy because he could not be liable to anyone injured by the gas and therefore would not need liability insurance."

The argument just quoted assumes that the only liability this policy covers is for damages arising from an accident in a fumigated house whereby some non-employee of the insured who enters that house before the fumigating gas has disappeared inhales the gas with disastrous results. This asumpstion is erroneous. This

policy covers any liability legally "imposed upon the Assured by law for damages on account of bodily injuries, including death . . . resulting therefrom, . . . within the policy period . . . by any person or persons other than employees of the Assured while within or upon the premises or *upon the sidewalks or other ways immediately adjacent thereto,* provided for the use of employees or public at the location described in Statement 4 of said Schedule, by reason of and during the business operations described in Statement 4, which operations, for the purpose of this insurance, shall include operations incident or appurtenant thereto, *including ordinary repairs and maintenance of the Assured's building and equipment.* This policy shall also cover injuries sustained *elsewhere than upon the premises described* in said Schedule, caused by employees *while engaged in the conduct of the Assured's business"*; with a proviso not applicable to this case. (Italics supplied.) The policy says "the term 'bodily injuries' is extended to include 'sickness and disease' ".

The policy reveals that "the places where work covered by this policy is to be done", which work may give rise to accidents covered by this policy, are "factories, shops, yards, or other premises of Assured in Reading, Berks County and elsewhere in Pennsylvania." The places covered by this policy are, therefore, not merely the houses which the insured fumigates. The insured is protected by this policy against liability arising from the use or handling of fumigating substances in "the places" above mentioned, or on "the sidewalks or other ways immediately adjacent thereto", i. e., adjacent to places where the Assured is carrying on *any phase* of his fumigating operations in "Reading, Berks County and elsewhere in Pennsylvania."

Under this policy the Assured is permitted to "use any substance which by itself or in combination with any other substance emits or liberates a gas, fume or

vapor used for the destruction or control of insects, fungi, vermin, germs, rodents, or other pests".

The insured *may* use a "substance" even more explosive than the gas used in the instant case and if an *explosion* or *fire* resulted from its use and non-employees of insured were injured, made sick or killed by the negligent use of that substance, the insured would be protected by this policy against liability.

This contract of insurance is a model of verbal clumsiness. The awkwardness of its grammatical construction and the illogical disarray of its clauses are indefensible. Many of the affirmative rights of the insured are expressed by the cancellation of one negative word by another negative. Nevertheless, a careful analysis of this policy reveals that it protects the insured from loss from liability on any suit "caused by any draught or driving animal or vehicle or automobile owned or used by the Assured or any person employed by the Assured while engaged in the maintenance or use of same upon the insured premises"; also if "caused by or claimed to have been caused by the consumption or use of any article or product manufactured, handled or distributed by the Assured upon the Assured's premises". Just what "insured premises" and "Assured's premises" are does not clearly appear but it is reasonable to interpret those phrases as including *any* premises on which the insured was doing any work contemplated by this policy or any acts incidental to such work. This policy *also covers* liability for accidents caused "by structural alterations, structural repairs, new construction or demolition of any building or plant", if "written permission for such work is endorsed on the policy."

Furthermore, should the employees of the insured use in any room of a house being fumigated the zyklon discoids which serve as containers of hydro-cyanic gas, *in such excessive quantities* that the gas when released from the discoids would be in such highly concentrated

form that it, if brought into contact with a lighted match or an electric spark (such as might be caused by a broken electric wire in a house), would explode and cause injuries, sickness or death to one not an employee of the insured, this policy would protect the insured against liability for the resulting legal damages and place upon the insurer the burden of defending or settling the claim. That the possibility of an explosion causing injury to *either* persons *or* property is recognized in this policy is shown by the fact that there is excluded from any claims for damages for which the insured is legally liable under this policy and damage or destruction to *property* which is caused by "an explosion of any character". An "item" in the policy reads as follows: "No explosives are used, allowed or kept at the place named in Statement 4, *except those usual to the work covered hereby.*" (Italics supplied.) This is a recognition of the fact that the substance "usual to" the insured's work is explosive in character.

That both the insurer and the insured in entering into this contract contemplated that violent accidents might result from the use of fumigating gas is indicated by the following "Condition F" in the policy: "The Assured shall not voluntarily assume any liability, nor incur any expense, other than for such immediate surgical relief as is imperative at the time of an accident, nor settle any claim, except at the Assured's own cost." The fact that the insured and the insurer recognized that "immediate surgical relief" may be "imperative at the time of an accident" is very illuminating as to the possibilities of violent accidents occurring in the handling and transportation and use of the inherently deadly and possibly explosive gas employed by the insured in his business.

The hydrocyanic gas used in the instant case and the still more deadly gas or substance which insured is under the policy permitted to use for the destruction of "insects . . . vermin, rodents or other pests" are such

deadly agents when handled, whether exploded or unexploded, that there are countless possibilities of accidents resulting from the negligent loading, transportation and use of these gases. For example, if the zyklon discoids in which this deadly gas is contained should either before or after the gas is liberated be left where boys would pick them up (as boys sometimes pick up sticks of dynamite carelessly left in an area) and injury, sickness, or death to those boys or to others should result from the handling of the discoids, this policy would protect the insured against liability for the damages inflicted. The dangerous character of the hydrocyanic gas used in fumigating is referred to in the testimony of Alexander Ehrlich. He testified that the zyklon discoids used in fumigating the premises where the infant child of Mrs. Binkley died as a result of inhaling the lethal hydrocyanic gas, is "the commercial name for a highly concentrated form of hydro-cyanic gas." He also testified that the discoids after being used on the premises "were gathered up, together with the tape, and for safety reasons burned in the back yard of the house." If they were not destroyed they would be a menace to life, limb and health. The possible accidents which may cause the injury, sickness, or death of non-employees of the insured are so obviously recognized by this policy as to indicate that the insured received for the $1069.28 annual premium he paid a protective policy well worth the price.

The "coöperation" the insurer required of the insured in tightly sealing any building to be fumigated so that the lethal gas would be confined to that building until the doors and windows were opened after the fumigation was completed, and in warning persons in adjacent properties of the fumigating operations, and in making adequate tests in the fumigated house to be certain of the absence of this deadly gas before the usual occupants of the house or any one else would be allowed to enter that house were entirely reasonable and in the interest

of public safety and they were stipulated in the policy in such a way as to make proof of compliance with them by the insured a prerequisite to any recovery on the policy for damages incurred or paid by the insurer for such a casualty as is disclosed by this record.

The accident which in this case brought death to the infant occupant of the fumigated house because of that occupant's reëntry into the house before the deadly gas had been eliminated from the house *by no means* illustrates the *only* possibility of accidents resulting in injury, sickness, or death which may be caused by the use of this or even more deadly gas permitted under the policy, by the defendant and his employees in the performance of their very dangerous work and in the transportation and handling and use of this deadly or even more deadly fumigating gas, in "Reading or elsewhere in Pennsylvania."

DISSENTING OPINION BY MR. JUSTICE HORACE STERN:

I dissent from what I cannot but regard as an extraordinary decision. If the majority opinion is correct, the plaintiff has been paying annually a very high premium (over $1,000) for a liability insurance policy not worth the paper on which it is written. While it is hornbook law that insurance policies should be construed most favorably to the insured, in the present case the court is construing the policy not only favorably to the insurance company but *so* favorably as to relieve it of any liability whatever under any conceivable circumstances.

For what purpose does a person take out such a policy? Obviously to obtain financial protection against any negligent conduct on his part which might involve him in liability to others. If he were always so careful as to avoid the likelihood of accident he would have no use for liability insurance, because, even if a third person were injured, unless such injury was due to negli-

gence on the part of the insured the latter would not be liable to the injured person and would therefore have no need for insurance. In the present case, for example, the mere fact that the child died from hydro-cyanic poisoning did not entitle its mother to recover against this appellant; it was incumbent upon her to prove that appellant in some way failed to observe all the precautions that a reasonably careful fumigator would have observed under the circumstances. The fact that she secured a verdict shows that, in the opinion of the jury, appellant did not measure up to that required standard of care. Therefore, when the majority opinion now attempts to show that he might or should have taken additional precautions it is merely engaged in establishing what has already been established in the suit of the mother against him, namely, that he was negligent. But his liability for the death of the child because of such negligence constitutes the very reason for which he is now entitled to recover on his insurance policy and for which alone that policy was designed. To hold, as the present decision does, that he cannot recover on the policy because of his negligence, is to say that the policy can *never* be enforced, because in the absence of negligence the insured would not be liable to the injured person and therefore would have no occasion for any claim against the insurance company; in other words, the only circumstance which could possibly justify his recovery on the policy automatically prevents such recovery. I cannot assent to such a legal paradox or to such an unjust and indefensible result.

It is true, of course, that if an insured agrees in a policy to perform certain covenants or conditions he is bound thereby, but it is obviously equally true that those conditions must not be so construed as to defeat the entire purpose of the policy and make recovery under it impossible.

There are two covenants in this policy which the majority opinion asserts were not performed and for

that reason appellant cannot recover. One is that "all overstuffed material including, but not limited to, furniture and bedding, will be beaten and adequate chemical or other test for the presence of gas will be made before allowing any person their use". It is said that appellant did not, either himself or by his employes, beat any of the furniture or other material. But certainly it is absurd for the insurance company to contend that under this clause the beating had to be done by the insured himself or by his own employes; if, as here, he instructed the occupants of the house to attend to the beating *and they did so,* what possible difference does it make if the beating was done by one person or by another? Witnesses, including the mother of the deceased child herself, testified that they beat thoroughly the mattresses, pillows, and all the bedding, including that on the bed in which the child subsequently died. But it is said that there were two pieces of furniture as to which there was no proof that they had been beaten, one a couch on the first floor and the other a sofa on the second floor. The answer to this is twofold: (1) There is nothing to indicate that failure to beat these particular pieces had anything to do with the death of the child or that any gas whatever emanated from them or either of them; therefore failure to beat them is of no legal import because not shown to have been a causal factor in the happening of the accident. (2) The clause in regard to beating the furniture provides that the beating is to take place and a test for the presence of gas made *"before allowing any person their use".* Obviously, therefore the beating and test (as distinguished from the test prescribed in another covenant hereinafter discussed) are only for protection *in connection with the subsequent use of the furniture to be beaten;* the purpose of the beating was to make such furniture itself safe for use. There is no evidence whatever that the couch and the sofa were used by anybody after the fumigation, certainly not by the child; the only articles used by the child or by anybody else

were the mattresses and the pillows, and these were all adequately beaten.

The other covenant which it is said was not performed by appellant, is that "No person will be permitted to enter the fumigated premises before the fumigator has satisfied himself by adequate chemical or other test and by personal inspection, without gas mask or other means of protection, of every part of the fumigated premises, that it is safe for human occupancy." What is the meaning of this clause? Does it mean that the fumigator must make such complete and exhaustive tests and inspection that the safety of the premises for occupancy is rendered certain? Does it mean that he must make such minimum tests as would be sufficient to exculpate him from any charge of negligence? I have already pointed out that if the fumigator had to measure up to such a standard in order to recover on his policy there would never be any need for him to have a policy because he could not be liable to anyone injured by the gas and therefore would not need liability insurance. It seems to me crystal clear that all that this clause does mean is that the fumigator must *in good faith* "satisfy himself" that the occupants of the house can safely re-enter. It is only if he does not *honestly* satisfy himself, and an accident results, that he disentitles himself to recover on his policy. There is not a shred of testimony in the present case to indicate that there was any lack of good faith in the conclusion of appellant's manager that the premises were safe for re-entry. The fumigation was finished around ten o'clock in the morning. Appellant's employes returned to the premises at five o'clock in the afternoon. They opened the doors and windows, and, after an hour's ventilation, the manager was able to enter without the use of a gas mask. He removed the chemicals from which the gas had been generated and made standard chemical tests at various points in the house which showed an entire absence of gas on the second and third floors and none on the first

floor except at one point on or under the couch. The majority opinion states in regard to this one spot that hydro-cyanic gas was there "in a deadly quantity." On the contrary, while the test disclosed up to 25 cubic feet of gas per million cubic feet of air at that point, the testimony was that "25 per million of gas can be tolerated for quite a while before they will cause [merely] *headaches or slight feeling of illness"*, and that that quantity was not sufficient to cause death. Although it was testified that under the weather conditions then prevailing it would ordinarily have been considered safe to allow the house to be reoccupied by the tenants after the lapse of between four and six hours (an opinion which the witness said was based on his experience of eight years of fumigation work), nevertheless the tenants were instructed not to re-enter the house until the following morning, and indeed Mrs. Binkley did not re-enter with her child until late the following afternoon, which was twenty hours longer than expert judgment had decided was necessary for safety. Plaintiff's manager was asked : "Q. Is it customary in your particular line of work to make a subsequent test after you had made the first tests, and show the results you had? A. I would say not, in the presence of only 25 per million gas. There were 12 more hours time available before the tenants came back, and it can be safely presumed that these 25 per million will dissipate during that 12-hour period. Q. In your opinion, based upon the experience that you have had, do you think it was safe to allow people to come back the next morning at seven o'clock? A. Yes, I would say yes." In spite of this testimony that the same tests were taken as were customary in the business and that the judgment exercised was based on long experience, the court is now saying as a matter of law that the appellant had no right to "satisfy himself" by thus following the prevailing and normal standards. Certainly, at the very least, it would be for the jury and not for the court exercising judicial hindsight to say whether appel-

lant did honestly and in good faith satisfy himself that sufficient precautions had been taken. It is true, of course, that the child died, but how it came to die is wholly unexplained; there may have been some undetected, and even undetectable, pocket of gas lurking in the flooring, or a gas-pocket may have formed in a closet and dissipated during the night. Mrs. Binkley testified that, sleeping in the bed next to her child, she did not smell or otherwise perceive any gas whatever in her apartment. The child's death was an accident which may have been due (as the jury in the suit brought by the mother has found that it was due) to some negligence on the part of appellant,—some failure to observe the measure of care which he owed to the child under the circumstances,—but to hold that therefore he cannot recover on this policy of liability insurance—intended, as it was, to protect him in that very event—is to render a decision which, in my opinion, is contrary both to the applicable rules of law and to the dictates of justice.

I would remove the nonsuit entered against appellant and award a procedendo.

---

DISSENTING OPINION BY MR. JUSTICE ALLEN M. STEARNE:

I dissent for an *additional* reason not included in the dissent of Mr. Justice HORACE STERN. In my view there has been a substantial performance of the assured's warranties contained in the rider of the policy of insurance.

This was an action in assumpsit on a policy of liability insurance issued by the defendant insurance company to the plaintiff, who was engaged in the business of exterminating vermin. The contract was to indemnify the plaintiff against liability for negligence by the assured or his employees. His employees were admittedly negligent, causing the death of an infant child. In a trespass action, the plaintiff was held liable and paid

the amount of the verdict rendered by the jury. He then brought suit against the defendant upon its policy. The court below entered a nonsuit which it refused to strike off.

As this was a policy indemnifying against negligence, I agree with Mr. Justice STERN that if the contract be construed to provide that the insurance company only indemnified the assured against his negligence provided the assured warranted to commit no negligence, such a contract would indeed be an anomaly. No business man of ordinary intelligence would accept such a contract. Heretofore a policy of insurance has always been construed favorably to the assured and not to the insurance company.

The defendant maintains that plaintiff violated the 5th and 6th clauses of the warranty reading as follows: "5. Minimum temperature of 60° Fahrenheit will be maintained during ventilation and all overstuffed material including, but not limited to, furniture and bedding will be beaten and adequate chemical or other test for the presence of gas will be made before allowing any person their use. 6. No person will be permitted to enter the fumigated premise before the fumigator has satisfied himself by adequate chemical or other test and by personal inspection, without gas mask or other means of protection, of every part of the fumigated premises, that it is safe for human occupancy."

The court below decided, *as matter of law,* that an "overstuffed" piece of furniture on the first floor and another piece of such furniture on the second floor had not been beaten and that therefore the insurance company was not liable on the policy.

According to the testimony, at the direction of the assured's foreman the owner of the apartment *did* beat overstuffed material, especially the bedding. It is true that the assured did not *affirmatively* prove that the two pieces of overstuffed furniture had been beaten, but on the other hand there was no evidence offered by

either the plaintiff or the defendant that it had *not* been so beaten.

As to the "adequate chemical or other test" it is conceded that such a test was made. It was described in detail. The foreman testified that, from his tests, he satisfied himself as to the safety of entry. This may have been a mistaken view. The test, it is true, may have been negligently made, but it was against such negligence that the plaintiff was insured and for no other discernible purpose.

The present situation is very different than that in *Sgarlat v. Griffith,* 349 Pa. 42, 36 A. 2d 330, where the insured failed to provide any watchman. It is more analogous to the case of *Lyford v. New England Mutul Life Insurance Company,* 122 Pa. Superior Ct. 16, 184 A. 469, where a watchman was furnished, but who failed in his duty. An owner of a business, with employees, is not required to perform all of these services *personally.* Necessarily such an employer is required to delegate duties to his employees. The purpose of the insurance was to protect the owner where his employees are negligent.

I would, therefore, reverse the judgment and submit the question of substantial performance to a jury.