## Allen v. Insurance Company of North America

*Ralph B. Umsted,* for plaintiff.

*C. L. Cushmore, Jr.,* for defendant.

JONES, J., July 28, 1953.—This is an action in assumpsit. The plaintiff in his Complaint claims damages from the defendant in the sum of $440.05 upon a cause of action founded upon an insurance policy issued by the defendant to the plaintiff, specifically

upon an addition thereto entitled "Extended Coverage", copy of which is attached to the said Complaint. The plaintiff avers his payment of the fixed premiums and the payment of an additional premium upon the "extended Coverage" endorsement and sets forth his cause of action and right of recovery under the terms of the "Extended Coverage" in the sixth paragraph of his Complaint which reads as follows:

"6. On Friday, December 28, 1951, about 10:30 A.M., an oil tank located in the basement of said premises and used for the storage and supply of fuel oil for the heating system in plaintiff's residence, exploded while said tank was being filled with new oil, in such a way that the oil in said tank suddenly found an outlet through the aperture in the tank caused by the explosion and flowed out of the tank upon the walls and floors of the laundry-room and game-room in said residence, causing the damage to said premises and to the furniture and property then located in said rooms hereinafter set forth."

The plaintiff also avers in his Complaint the nature of the damage and the amount thereof and concludes with a claim for the said sum of $440.05 "with damages for delay in payment thereof equal to interest on said amount from December 28, 1951".

The defendant in its Answer thereto admits the various allegations relating to the issue of the policy and the "Extended Coverage", denying only the date of the issue of the "said insurance". The defendant denies that there was an explosion, denying specifically the averments of the recited paragraph 6 of the Complaint, admits the demand on the part of the plaintiff for the payment of the recited damages and its refusal thereof upon the ground that it was not liable under the terms of the insurance policy with its "Extended Coverage".

It is evident upon a consideration of the pleadings filed that the claim of the plaintiff is based upon the language of the said "Extended Coverage" reading as follows:

"Extended Coverage

"(Perils of Windstorm, Hail, Explosion, Riot, Riot Attending a Strike, Civil Commotion, Aircraft, Vehicles, Smoke, Except as Hereinafter Provided)

"In consideration of the premium for this coverage shown on reverse side hereof, and subject to provisions and stipulations (hereinafter referred to as 'provisions') herein and in the policy to which this endorsement is attached, including riders and endorsements thereon, the coverage of this policy is extended to include direct loss by WINDSTORM, HAIL, EXPLOSION, RIOT, RIOT ATTENDING A STRIKE, CIVIL COMMOTION, AIRCRAFT, VEHICLES AND SMOKE."

Jury trial having been waived, the parties proceeded to trial before a judge functioning as a jury under authority of Section 12 of the Act of July 12, 1913, P. L. 711, as amended by the Act of June 20, 1919, P. L. 515, 17 P. S. 695. In such non-jury trial the finding of the trial judge is as the verdict of a jury.[1]

At the trial of the cause the plaintiff testified that the damages for which he makes claim occurred in the ground floor or basement of his home, 5919 Castor Avenue; that upon December 28, 1951, as the result of a telephone call, he went to his home and found that the floor of the laundry and a large part of the floor in the gameroom was flooded with oil from the tank which supplies oil to the heater, some of the oil having run out under the door which is an exit to the driveway to the rear, the oil in some places being a

[1] Jann v. Linton's Lunch, 150 Pa. Super. Ct. 653, 656 (12/11/42); Schoenfeld v. Meckes, 57 D. & C. 531, 547, 548 (7/16/46).

half inch deep and "then tapering off to very little"; that upon examination he saw that the oil had come "from the rear of the oil tank and the portion of it which was at the joinder of the two walls. Facing the tank from the front, the tank was against the lefthand wall, and the rear wall was against the rear of the tank. And there was no evidence of any oil coming from a visible part, but it was in the corner where the two walls joined."

He testified further that he was informed that the tank was irreparable, that he authorized an employee of the Magee Oil Company to tear out the oil tank and put a new one in immediately, that thereupon he examined the tank carefully; that it "was approximately four and a half feet high with a clearance of four or five inches under it" and "had a capacity of two hundred seventy-five gallons", was "five feet long and probably twenty-two to twenty-four inches wide"; that there was a large gash at the joinder of the two walls of the tank and that "Along the seam of the tank itself where the pieces of metal had been welded together, there was a gash . . . which was eighteen and a quarter inches long and was an inch and a quarter wide at its widest point and varying from there down to zero. The two sides of the tank, the metal sides, were slightly bent from the level of the tank itself spreading outward, and the edges were somewhat fluted, as I call it, perhaps undulating and varying slightly as they ran along the aperture."

It was testified that the steel was "just about three-sixteenths of an inch" thick, that the steel at the edges "of the flaring aperture" was "perfectly clean and almost shiny". Plaintiff testified that he had seen the tank the morning of December 28, that he had looked at it the preceding evening, that there was no evidence of oil on the floor and no odor of any oil, that the gauge indicated that the tank was "somewhere under one

quarter full", holding therefore an estimated fifty or sixty gallons and for such reason the oil company was called to refill the tank, that the oil company replaced the tank and cleaned up the oil.

Upon cross-examination the plaintiff testified that he couldn't see the "aperture" in the tank until the tank was taken out, that the "split began just slightly under the point where the tank began to curve into the oval part and ran vertically down, but had not reached the part where it begins to get oval again for the bottom"; that there was oil in the oil tank after the leakage, that it was "pumped out and poured out, and for several days when the tank was lying in my back yard, the oil dripped out of there", that he could tell "almost exactly" how much had been pumped out, that "One hundred nineteen gallons was put in at the time the tank was shut off, and my estimate was there was sixty gallons within the tank before they started to fill it. I should say about one hundred seventy-nine or one hundred eighty gallons." He testified that the tank was already installed when he bought the premises "as a new house" in December of 1938, that there was a vent pipe and a fill pipe, that the "fill pipe ran outside into the driveway . . ." and that the vent pipe "went farther up . . ." Whether the tank was in use prior to December, 1938, when it was fabricated, what its condition was when installed, of these facts there is no evidence.

Ada C. Allen, wife of the plaintiff, testified that after the tank was out subsequent to the morning of December 28, 1951 she examined it and saw that it had a long "gash" in the welded part, the "center part of the gash was wide, about an inch and a quarter wide, and the ends, of course, came together as it went to the top" and that it reached "well, partly, half way down the tank", that the sides of the aperture spread out from the tank, being "more ruffled at the wide

part of the break. But toward the end where it came together again, they began to straighten a bit there." She testified that she saw the tank at approximately ten o'clock of the morning of the twenty-eighth when she went down to open the door for the driver to put the oil in; that she was on her way out and returned to the house about ten-thirty at which time she smelled "A perfectly terrific odor" and heard "blub, blub, sort of down the cellar" and upon going part way down the cellar steps she saw "that the oil had gone more than halfway over the library floor", that there was so much oil on the floor she couldn't go down; that when she let the oil man in the cellar there was no evidence of oil overflowing or gushing forth and no oil odor. Upon cross-examination she described the "blub, blub, noise" as sounding "like something overflowing from somewhere".

William Stinger, an employe of the Harry Magee Oil Burner Company, testified that he called at the home of the plaintiff upon December 28, 1951, with an order for oil, that he checked the tank, looked at the gauge which showed "A little under a quarter"; that he noticed no odor of oil or any oil on the floor; that he put the hose in the intake just outside the house, closed the door and waited for the meter which he had set in his truck to go off automatically when he noticed the curtains on the cellar door move, that he thereupon shut the oil off and as he did so he saw "oil coming out the cellar door into the drain right outside"; that he opened the door and "all I could see was oil all over. I thought at first the tank overflowed". He testified that the tank was not overflowing, that he was unable to see where the oil was coming from other than that "it was in between the wall and the tank, or the wall where the tank was against". Thereafter he reported the situation to his company. In answer to the question: "Do you remember how much oil you put in the

tank at the time you shut off the valve?", he answered, "I figured about eighty or ninety gallons. It's been a while ago. But I know it was somewhere around there, I think." Upon cross-examination when asked whether the vent pipe was clear, he answered, "It had to be, or the oil would have came out of the pipe where I put it in."

The amount of the damage as averred by the plaintiff is not disputed. It was agreed by counsel for the parties to be correct, the defendant, however, denying liability therefor.

The defendant presented no evidence and submitted a request for finding.

The plaintiff requested the court to find for the plaintiff in the sum of four hundred forty dollars and five cents with interest from December 28, 1951. The request was denied.

The trial judge made a finding for the defendant. The attorney for the plaintiff filed "Motion and Reasons for a New Trial" and "Motion for Judgment Notwithstanding the Finding." Written briefs were filed and oral argument was had upon the motions. The court en banc dismissed the plaintiff's motions and entered judgment for the defendant upon the finding of the trial judge.

The plaintiff's "Reasons for a New Trial" were stated to be "1. The finding was against the evidence. 2. The finding was against the weight of the evidence." Such motion raises nothing other than a question of basic and fundamental error.[2] That there was no such error in the instant action is manifest.

The plaintiff's "Motion for Judgment Notwithstanding the Finding" is without merit. Nothing presented at the trial made it obligatory upon the trial judge to make a finding for the plaintiff. The court en banc

---

[2] Robinson v. Korber, 357 Pa. 7 (5/26/47).

therefore was without authority of law to enter judgment for the plaintiff notwithstanding the finding of the trial judge.

The defendant insured the plaintiff against the peril of an "Explosion". The language of the policy is "direct loss by . . . Explosion".

What is an explosion? Did an explosion as such term is used in the "Extended Coverage" cause "the aperture" in the tank with the averred consequent damages? These are the questions involved.

"Insurers are answerable for direct and immediate, not for consequential and remote, losses from a peril insured against. When that is fire, the instrument of destruction must be fire. On no other principle than that the character of the loss is determinable by the proximate cause of it, could the insurers have been held liable . . ."[3]
Hence it is that to hold the defendant liable in the instant case "the instrument of destruction" must be "explosion".

It is settled law that, there being no ambiguity, the words of an insurance policy are to be understood as having been used in their plain ordinary meaning and common signification.[4] ". . . The term (explosion) as used in policies of insurance must be supposed to have been used in its ordinary and popular meaning . . .'. . . The terms of this policy must be taken in their ordinary sense': . . ."[5] "The term (explosion) is to be construed in its popular sense, and as

---

[3] Hillier v. Allegheny Mutual Ins. Co., 3 Pa. 470, 473 (9/21/ 1846), (opinion by Gibson, C. J.).

[4] Skelly v. Fidelity and Casualty Company of New York, 313 Pa. 202 (11/27/33); Ehrlich v. United States Fidelity and Guaranty Company, 356 Pa. 417, 423 (3/29/47).

[5] Tannenbaum, appel., v. Fire Ins. Companies, 127 Pa. Super. Ct. 278, 284 (7/15/37).

understood by ordinary men, and not by scientific men." [6]

The term, explosion, has been defined to be "a violent expansion or bursting with noise, as of gunpowder or a boiler; the noise itself; any violent bursting forth;". ("The New Century Dictionary", Vol. 1, p. 535.) "The action of 'going off' with a loud noise under the influence of suddenly developed internal energy"; "Of a gas, gunpowder, etc." ("A New English Dictionary on Historical Principles; . . . Oxford: . . . 1897", Vol. III, "E", p. 440.) Webster's New International Dictionary, Second Edition, Unabridged, defines an explosion as a "detonation; a violent bursting or expansion with noise following the sudden production of great pressure, . . ., or a sudden release of pressure as in the disruption of a steam boiler; also the noise made by such bursting." (p. 898) "It (explosion) is not used as the synonym of combustion. An explosion may be described generally, as a sudden and rapid combustion, causing violent expansion of the air, and accompanied by a report." [7]

The distinguishing characteristic of an explosion is the detonation. The terms, rupture, bursting, explosion, are not synonymous. There may be a rupture or bursting without an explosion, without the accompanying noise or report.

The use of the terms, bursting, rupture, explosion, in the exclusion clause, "Provisions Applicable Only to Explosion:" emphasizes the distinction in meaning and use of these terms. An exclusion clause narrows the coverage of the policy. It does not enlarge it. The peril insured against is "direct loss by . . . explosion,

---

[6] 25 C. J. 178, citing Mitchell v. Potomac Insurance Co., 183 U. S. Reports 42, 52 (11/11/1901).

[7] United Life, Fire and Marine Ins. Co. v. Foote et al., 22 Ohio State Reports 340, 347, 348 (1872).

. . ."; it is not direct loss by rupture, by bursting. If so, rupture or bursting of what? Had the term, explosion, been understood and used as embracing a rupture and/or a bursting of the equipment in the building, would not such understanding appear affirmatively in the coverage provisions of the policy? This fact is demonstrated by a reading of the various clauses of the "Extended Coverage" wherein the meaning and use of terms are specifically and expressly defined. The plaintiff did not state his cause of action to be a rupture or a bursting of the oil tank. He averred in his Complaint the right to recover damages caused by the explosion of the oil tank and as the result of a flow of fuel oil "through the aperture in the tank caused by the explosion" "while said tank was being filled with new oil". Such was the theory of the plaintiff's case expressed in his pleading and presented at the trial.

Turning to the evidence, it is to be noted that the plaintiff avers the time of the alleged explosion to have been about 10:30 A. M., on Friday, December 28, 1951, at which time he avers oil was being pumped into the tank. The sole person present at the time was the witness, William Stinger, who had charge of the oil-filling operation. The oil was being pumped into an "intake" from outside the house. There was a vent pipe through which air from the tank escapes. The oil was being forced into the tank by a motor upon the delivery truck which operates at four speeds. While operating at "top speed" he sees curtains on the cellar door "move", oil flowing into the drain outside the cellar door and upon opening the door he sees the cellar floor being flooded with oil. He heard no explosion, no noise, no report. He testified that he thought the tank had overflowed. The "flutter" of door curtains is not surprising, for oil was being forced into the tank and thence through an aperture unknown and

hidden from view into the cellar in such quantity as to cover the floor and flow under the door into an outside drain. Is it strange that the door curtains should move under such conditions?

The evidence discloses nothing done on this occasion that differed from what was done in the process of filling in the course of the use of the tank by the plaintiff during the thirteen years' period of his ownership. Fuel oil, a non-explosive liquid, was pumped into the tank in the same manner and by the same means. Is it unusual, contrary to common experience to find material things wear thin, weaken with use, disintegrate and finally become unfitted for the purpose for which they were designed? There is no evidence that the filling operation caused the aperture. It may have existed prior thereto. The unseen, unknown opening was disclosed by the outpouring oil upon the basement floor. Had there been an explosion, "the action of 'going off' with a loud noise under the influence of suddenly developed internal energy", would not the witness who conducted the filling operation have heard the "loud noise"; would not the "violent expansion of the air" "accompanied by a report" have manifested itself to such witness at the "intake" and the "ventpipe"? Of such happenings there is no evidence. The evidence is to the contrary.

Of direct evidence, "that means of proof which tends to show the existence of a fact in question, without the intervention of the proof of any other fact", there is none.

Of circumstantial evidence, "the proof of facts which usually attend other facts sought to be proved; that which is not direct evidence", there is none.

A finding that an explosion was "the instrument of destruction," the cause of the aperture at the time and under the circumstances testified to, would be

speculative. The age of the tank, its condition, the aperture discovered after oil had spread upon the basement floor and the removal of the tank do not establish an explosion as the cause of the opening at the welded seam. The possibilities are many, limited only by the fertility of one's imagination. The burden of proof resting upon the plaintiff is not sustained by guesses, conjectures, speculations, nor is the liability of the defendant determined thereby.

The evidence presented questions of fact, credibility as to which was solely for the jury and the weight of which was primarily for the jury and secondarily for the trial court.[8] In the instant case the trial judge functioned as a jury and made his finding accordingly.

The finding of the trial judge, the dismissal of the plaintiff's motions and the judgment entered by the court en banc are devoid of error.

---

[8] "Sitting as a court of last resort, we cannot reverse merely because we may think the verdict was against the weight of evidence." The Philadelphia and Reading Railroad Co. v. Yerger, et al., 73 Pa. 121, 125 (5/17/1873). Aaron v. Strausser, 360 Pa. 82, 88 (7/7/48). "The credibility of the witnesses and the weight to be accorded their testimony were for the trial judge as the finder of the facts." Robinson Electrical Co., Inc., v. Capitol Trucking Corporation, 168 Pa. Super. Ct. 430, 434 (3/12/51).