Commonwealth of Pennsylvania, State Highway and Bridge Authority (PennDOT), Petitioner v. General Asphalt Paving Company, Respondent.

Argued February 9, 1979, before Judges ROGERS, BLATT and DISALLE, sitting as a panel of three.

*Arthur H. Marateck,* Assistant Attorney General, with him *Robert W. Cunliffe,* Deputy Attorney General, and *Robert P. Kane,* Attorney General, for appellant.

*Charles V. Stoelker, Jr.,* with him *Meeham and Stoelker,* for appellee.

OPINION BY JUDGE DISALLE, September 19, 1979:

The Commonwealth of Pennsylvania, State Highway and Bridge Authority (PennDOT), has appealed to this Court from an order of the Board of Arbitration of Claims (Board), awarding additional compensation to General Asphalt Paving Company (General) because the road construction work in which it was engaged was delayed for almost three months. The sole issue is whether an express provision in the construction contract which excludes claims for additional compensation on account of delay "caused by the failure of the owners of structures on, under and/or over the project to adjust their facilities during the progress of any portion of the work" is a bar to the claim.

On February 24, 1966, General and PennDOT entered into a contract for the resurfacing and improvement of a part of Verree Road in Philadelphia, Pennsylvania. That portion of the contract with which we are concerned reads in relevant part as follows:

1.8.3. PUBLIC OR PRIVATE STRUCTURES ON THE PROJECT—

(1) *Structures interfering with Contractor's Operation.* The contractor is required to fully inform himself concerning location of public and private structures on, under and/or over the project which may or may not require removal, resetting, construction and/or reconstruction, and which may interfere with his operations, and it shall be assumed that he has prepared his bid and entered into the contract in full understanding of the conditions to be encountered and his responsibility in connection therewith. . . .

. . . .

It shall be the responsibility of the contractor to make proper arrangements with the owners of structures on, under, and/or over the project, or to take requisite action for the removal, resetting or reconstruction of such structures and facilities which may be required by the construction. The contractor shall cooperate with the owners of structures on, under and/or over the project to arranging and performing his work in and around such structures, *without additional compensation,* to facilitate their preservation, reconstruction or relocation. The work of the contractor shall be arranged and performed in accordance with good engineering and construction practices. The [PennDOT] engineer will cooperate in

working out the construction problems involved, but without relieving the contractor of his responsibility therefor.

(2) *Delays in the Performance of Work.* Delays may be expected in the performance of the work under contract in order to permit public and private structures to be removed, constructed, and/or reconstructed, but the work under contract may be required to proceed as deemed advisable by the engineer for the convenience and facility of the public use of the project. *No charges or claims for additional compensation shall be made by the contractor for any delays or hinderances, regardless of duration or extent, caused by the failure of the owners of structures on, under and/or over the project to adjust their facilities during the progress of any portion of the work embraced in the contract, but the contractor may be granted a remission or extension of time for the completion of the work in accordance with Section 1.8.6.* (Emphasis added.)

The work under the PennDOT contract was to be done in two stages. Stage One was to begin on April 28, 1966 and finish by November 15, 1966, while Stage Two was to be performed between April 6, 1967 and November 14, 1967. On March 21, 1966, General entered into a separate contract with the City of Philadelphia (City) for sewer and water work within a section of Verree Road covered by the PennDOT contract. That work was to be done during Stage One of the PennDOT contract.

Before the work began, a problem arose concerning an existing 12-inch water main under the surface of a portion of the road, the location of which might interfere with the proposed construction. City owned the

118

main, and the matter was considered at a meeting on March 9, 1966. With respect to this meeting, the Board made the following finding:

> 19. At preconstruction meeting on March 9, 1966, Plaintiff was told by R. G. Windisch, then District Construction Engineer [for Penn-DOT], that problems resulting from shallow-ness of pipe—i.e., scheduling, restriction on use of Contractor's equipment and lowering of pipe would 'be taken up in the field . . . *between the State, Right-of-Way and the Water Departments.'* (Emphasis added.)

General commenced work on Stage One on April 28, 1966, and, as planned, completed all that it was required to do under that stage of the PennDOT contract and under the City contract by November 2, 1966. The City's failure to relocate the 12-inch water main made it impossible to begin work on Stage Two, however, so on March 20, 1967, more than one month before that work was to begin, General sent a letter to PennDOT requesting that the line be relocated. PennDOT forwarded the letter to City's water department, which, after initially opposing attempts to relocate the main, eventually agreed to do so, and on April 3, 1967, moved its forces on to the job site. For the next two months, General sent letters to PennDOT, complaining that City's forces were working too slowly and haphazardly, and that, at one point, they had stopped working altogether and left the site. Penn-DOT assumed an active role in the dispute, forwarding all correspondence to City and receiving answers for General. General was finally able to begin work on Stage Two on June 12, 1967, and it finished the job in November, 1967. General filed a claim for delay damages with the Board, such damages being stipulated at $47,432.31, and the Board ruled in its favor. We will affirm.

The Board made the following significant findings of fact:

14. Although Plaintiff was ready to commence Phase B, Stage II on April 6, 1967, it could not commence until June 13, 1967.

15. By reason of the presence of City's employees within the area of Phase B, Stage II, Plaintiff was delayed in the performance of its Contract 2.7 months. (Stipulation of counsel.)

. . . .

20. Plaintiff performed work outside the scope of the Contract between Plaintiff and Defendant—lowering water services—for the City of Philadelphia on a basis that was negotiated by the Department of Highways.

21. Plaintiff made no agreements for extra work directly with City; all was done through Department of Highways.

22. On the issue of lowering the said twelve inch water main, Plaintiff had no direct dealings with the City of Philadelphia. All dealings were through Department of Highways.

. . . .

25. The Department of Highways, through its District Engineer, Paul J. Thomas, did not suggest that Plaintiff deal directly with the City on the relocation of the twelve inch water main; rather it forwarded all correspondence to the City and received answers for Plaintiff.

The Board concluded that PennDOT's involvement in the efforts to relocate the main relieved General of its duty to negotiate the relocation and prevented PennDOT from attempting to impose that obligation on General.

We find substantial evidence in the record to support the Board's findings that with regard to the 12-

120

inch main, General had no direct dealings with City but instead relied totally on PennDOT to negotiate the relocation. It is true that in its May 8, 1967 letter to PennDOT, General indicated that it had that day contacted the water department by phone to seek permission to complete the relocation work itself. However, we cannot agree that this single communication, occurring after repeated unsuccessful attempts by General to have PennDOT expedite the work, and after City employees had actually left the job site, leaving the relocation work incomplete, compels a rejection of those findings.

We must now determine the legal effect of PennDOT's assuming responsibility for negotiating the relocation of the water main. The case of *Gasparini Excavating Co. v. Pennsylvania Turnpike Commission*, 409 Pa. 465, 187 A.2d 157 (1963) is controlling. There, the plaintiff-contractor contracted with the Turnpike Commission to perform excavation work on a portion of the highway. The Commission ordered plaintiff to begin work on a certain day, knowing that the presence of a slushing contractor at the site would make it impossible for plaintiff to start at that time. Although the contract anticipated the coterminous presence at the site of slushing contractors and plaintiff, and contained a clause specifically disallowing compensation for delays caused by the work of such contractors, the Supreme Court reversed the lower court's denial of delay compensation, holding that by ordering plaintiff to begin work at a time when it knew plaintiff could not, the Commission had directly interfered with plaintiff's ability to do its job and could not assert the exculpatory clause in the contract as a defense to its liability for delay damages. *See also Department of Highways v. S. J. Groves and Sons Co.*, 20 Pa. Commonwealth Ct. 526, 343 A.2d 72 (1975). Here, the Board made the following conclusions of law:

6. Plaintiff's delay was due entirely to the Department of Highway's failure to have right-of-way ready for Plaintiff's work forces when Stage II work was ready for commencement.

7. The Department of Highways failed to give Plaintiff an unimpeded right-of-way in which to work, after giving its notice to proceed.

In the instant case, PennDOT does not dispute the fact that it knew of the existence of the 12-inch main from day one. By not acting any more expeditiously than it did in negotiating the relocation of the main, after assuming responsibility for such negotiations, PennDOT, like the Commission in *Gasparini, supra,* directly interfered with General in a way that was not within either party's contemplation at the time the contract was signed. Given our scope of review, we are not inclined to disturb the Board's findings and conclusions. We hold that PennDOT may not rely on the exculpatory language in the contract and must pay General delay compensation, as ordered by the Board.

We affirm.

### ORDER

AND Now, this 19th day of September, 1979, the order of the Board of Arbitration of Claims, dated January 25, 1978, awarding General Asphalt Paving Company $47,432.31 plus interest, is hereby affirmed.

---

DISSENTING OPINION BY JUDGE BLATT:

I must respectfully dissent.

I cannot accept the Board's legal conclusion that PennDOT is estopped from asserting the contractual provision placing the burden of negotiation and the risk of delay on General. "To constitute a waiver of a legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right

and an evident purpose to surrender it. . . ." *Brown v. Pittsburgh,* 409 Pa. 357, 360, 186 A.2d 399, 401 (1962). Likewise, "[o]ne who asserts estoppel must establish the essentials thereof by clear, precise and unequivocal evidence." *Funds For Business Growth, Inc. v. Maraldo,* 443 Pa. 281, 288, 278 A.2d 922, 926 (1971). Consequently, whether the theory upon which the Board relied is characterized as estoppel or waiver, it is clear that the findings do not support its application here. The ambiguous statement by Penn-DOT's engineer that problems resulting from the shallowness of the main would be "taken up" in the field cannot, I believe, be considered a clear and unequivocal demonstration that PennDOT assumed responsibility for the relocation and relieved General from responsibility therefor. Indeed, this expression is perfectly consistent with PennDOT's contractual obligation to "cooperate in working out the construction problems involved, but without relieving the contractor of his liability therefor." *See* Section 1.8.3(1) of the Agreement, *supra.* Nor do I think that Penn-DOT's forwarding of the correspondence, rather than insisting on direct negotiations between the responsible parties, supports the Board's conclusion. In fact, in the course of the exchange of correspondence, Penn-DOT reminded General by letter that "[t]he problem of coordinating the various utilities is the contractor's responsibility and any claim for reimbursement is unjustified." Again, PennDOT's participation seems only consistent with its promise to cooperate in working out problems as such occurred. The possibility of delay in relocating utilities was clearly envisioned by the parties to this contract, and the risk arising therefrom was specifically assigned to General, although PennDOT promised to cooperate in working out any problems. I do not think, therefore, that General can argue, on the basis of this record, that PennDOT's co-

operation and participation in the relocation negotiations relieved General of its responsibility.

Finally, I think that *Gasparini Excavating Co. v. Pennsylvania Turnpike Commission,* 409 Pa. 465, 187 A.2d 157 (1963), on which the majority relies, is inapposite here. In *Gasparini* there was also a contract between the parties which excluded damages for delay. Our Supreme Court refused to recognize this provision, however, because the appellant contractor was given notice to proceed by the appellee who knew the site was occupied by another contractor in a manner which precluded the operations of the appellant contractor. The Court reasoned that "there was interference by the appellee after ordering appellant to begin performance of work and then denying access to the work area occupied by another contractor. . . ." 409 Pa. at 476, 187 A.2d at 162. The Court essentially recognized that the appellee itself had brought about a delay which was unforeseen by the appellant contractor. In the instant case, however, PennDOT was not responsible for the delay because it had no obligation to negotiate the relocation which can be likened to the duty of the appellee in *Gasparini* to provide a site at which the contractor could work. Moreover, the very type of delay encountered here was foreseen and provided for in the contract.