506 A.2d 862

**COATESVILLE CONTRACTORS & ENGINEERS, INC., Appellant,**

v.

**BOROUGH OF RIDLEY PARK, Appellee.**

Supreme Court of Pennsylvania.

Argued Dec. 3, 1985.

Decided March 19, 1986.

Reargument Denied June 4, 1986.

554

Eugene H. Jarrell, III, Media, for appellant.

Thomas L. Kelly, Philadelphia, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDER-MOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

LARSEN, Justice.

In this appeal we are asked to decide whether the lower court erred in entering a compulsory nonsuit against the appellant, Coatesville Contractors & Engineers, Inc. (Coatesville-appellant) in its action in assumpsit and trespass against appellee, Borough of Ridley Park (Ridley Park-appellee).[1] Coatesville initiated the action seeking to recover additional compensation in excess of the contract price called for in an excavation contract between the parties. Reviewing the evidence in a light most favorable to the appellant,[2] the record establishes the following:

In the summer of 1977, Ridley Park advertised an invitation for bids for certain excavation work to be performed at Ridley Park Lake.[3] Upon learning of the invitation, the appellant, through its agents, made an inspection of the job site in preparation of submitting a bid. The pre-bid on-site inspection revealed an area that was once a lake, but at that time was filled with silt. There was a small stream flowing through the area of silt giving the appearance of a meadow or a field. After making the inspection, appellant prepared and delivered its bid for the excavation job. The bid was submitted on official bid documents provided by appellee. Among other things, the bid documents set forth specifications for the removal of silt from the lake site. Paragraph 1 of the specifications provided:

> The lake has been drained and shall remain in the drawdown condition until all silt debris removal work has been

1. Suit was filed against appellee, Borough of Ridley Park, John P. Damon, the borough engineer, and H. Gilroy Damon Associates, Inc., the engineering firm which employed John P. Damon. Prior to trial the actions against John P. Damon and H. Gilroy Damon Associates, Inc. were withdrawn and the case proceeded against the appellee.

2. *Ehrlich v. United States Fidelity and Guaranty Co.*, 356 Pa. 417, 423, 51 A.2d 794, 797 (1947); (In reviewing the entry of a nonsuit, "the evidence received at trial, ..., as well as the reasonable inferences therefrom [must be considered] on the basis most favorable to the plaintiff." [citation omitted] )

3. Along with Ridley Park lake the job site included a settling basin and a portion of a creek that ran from the basin to the lake.

completed.   The contractor shall remove silt and debris from areas as herein and shown on the plan.

The appellant was the low bidder and was awarded the contract.   In November, 1977, after receiving notice of its successful bid, Mr. John Fallon of Coatesville made another inspection of the lake site with a view toward getting the job started.   On this second inspection the job site was found to be in a condition similar to that observed at the September pre-bid inspection.   The lake bed was still full of silt and the small stream continued to run through the silt area.

In late March, 1978, appellant received notice from Ridley Park to begin work on the job. Responding to the notice, appellant sent workmen to the job site to commence operations.   When appellant's workers arrived at the site, it was discovered that the lake was completely filled with water. John Fallon of Coatesville immediately notified the borough engineer, Jack Damon, of the unexpected water condition. Mr. Fallon informed the appellee that appellant had a couple of days work to do in other portions of the job site away from the main body of the lake and could get started on those other areas even though the lake was filled with water.   Mr. Fallon indicated, however, that at such time when the appellant's work progressed to the lake, it would be necessary that the appellee have the lake drained of water and kept in the drained condition appellant observed in its September and November inspections, and which was called for by the bid documents and contract specifications.[4] Based upon Mr. Fallon's conversations with the borough engineer, appellant reasonably concluded that the appellee would take the steps necessary to remove the water from the lake and work was commenced.

**4.** The bid documents define the contract between the parties as follows:

"*Contract*" shall mean the entire agreement between the parties, including the General Provisions, the *specifications,* Contractor's accepted proposal, the Advertisement of the Information for Bidders, copies of which are bound herewith, and the Contract Drawings, all of which are hereby made a part hereof as though herein set forth in full.   (Emphasis supplied.)

The water remained in the lake throughout the spring and summer of 1978. From time to time, borough employees would go out on the lake in a boat and, with long poles, try to open a valve, ostensibly to accelerate the flow of water out of the lake. These efforts were consistently unsuccessful. Appellant continued on the job during this time and eventually, in early August 1978, considered its performance completed. Appellant billed Ridley Park for an additional $17,000.00 over and above the contract price, most of which had already been paid. The added $17,000.00 represented additional costs allegedly incurred by appellant because the lake was filled with water and remained that way while appellant performed its work under the contract.[5] Appellee disputed appellant's assertion that the job was finished and insisted that further work had to be done before the contract was completed. After negotiations between the parties over the question of whether appellant's performance was complete, the appellee agreed to hire a subcontractor to drain the water from the lake. The subcontractor engaged by appellee successfully drained the lake in March, 1979. Appellant returned to the job site after the lake had been drained and did the additional work insisted upon by appellee. Subsequently, Ridley Park refused to pay the invoice for additional expenses in the sum of $17,000.00 and appellant filed suit. At the close of appellant's case, the trial court granted appellee's motion for a compulsory nonsuit. Appellant's timely motions to

5. Appellant's witness, John Fallon, testified that appellant was forced to employ a method of digging and excavating which was different than that originally planned at the time of the bid. The water in the lake interfered with excavation. The excavating bucket could not be filled to more than one-half capacity because the water would cause overflow. Full loads could not be taken by the trucks. The excavated materials would slosh around in the truck bed and seep through the tailgate and sides. This made maintenance of the roads much more difficult in that the appellant was required to constantly clean the highways and streets. Additionally, because of the water, the appellant had to keep building up the shore and lake area with heavy ballast to make it stable. Further, the appellant was on the job from the end of March to early August and then went back in March of the following year to do additional work even though the contract called for performance in sixty working days.

remove the nonsuit and for a new trial were denied. On appeal, the Superior Court affirmed. Appellant's petition for allowance of appeal to this Court was granted.

The appellee argues that Coatesville is precluded from recovering on any claim for additional compensation by the exculpatory language contained in the contract between the parties. Specifically, appellee relies upon the following contract provisions:

*Article II. Payments*

3. The Contractor shall not be entitled to demand or receive payments for any work as extra work, unless ordered in writing by the Committee to do the same as such, and at a price fixed by them previously to its commencement.

*Article III.   Plans and Specifications*

2. The Contractor agrees that he has satisfied himself by his own investigation and research regarding all of the conditions affecting the work to be done and labor and material needed, and that his conclusion to execute this contract is based on such investigation and research, and not on the estimate of the quantities or other information prepared by the Engineer, and that he will make no claim against the Municipality because of any of the estimates, tests or representations of any kind affecting the work made by any agent of the municipality may prove to be in any respect erroneous.

*Article IV.   Progress and Conduct of Work*

2. The Contractor shall not be entitled to any claims for damages from any *hindrance* or *delay* from any cause whatever in the progress of the work, or any protion thereof, but when such *hindrance* or *delay* results from causes entirely beyond the control of the contractor, said *hindrance* or *delay*, excepting such as may from time to time result from ordinary and not unusual weather conditions for the season of the year when he is at work, may entitle the contractor to such an extension of time for completing the contract as may be determined by the Committee, provided the contractor shall have given no-

tice in writing of the cause of the detention. (Emphasis supplied.)

7. If any dispute or difference shall arise as to the efficiency of labor, or quality of materials employed or as to the proper execution of the work, they shall be settled by the Committee whose decision shall be final and conclusive.

*Article V. Legal Relations and Contractor's Miscellaneous Responsibilities*

4. All loss or damages arising out of the nature of the work to be done under the contract, or from any unforeseen obstructions or difficulties which may be encountered in the prosecution of the same, or *from the action of the elements*, or from *encumbrances on the line of the work*, shall be sustained by the contractor. (Emphasis supplied.)

The appellant counter-argues that the exculpatory provisions relied upon by the appellee lack validity as a defense to the claim for additional compensation because appellee affirmatively interfered with appellant's performance and failed to act in an essential matter necessary to the prosecution of the work under the contract. Appellant submits that there was sufficient evidence to show both appellee's positive interference and its failure to act in an essential matter.

It has been long settled that a compulsory nonsuit can only be granted in cases where it is clear that a cause of action has not been established. The plaintiff must be given the benefit of all favorable evidence along with all reasonable inferences of fact arising from that evidence. Any conflict in the evidence must be resolved in favor of the plaintiff. *Morena v. South Hills Health System*, 501 Pa. 634, 462 A.2d 680 (1983); also *Ford v. Jeffries*, 474 Pa. 588, 379 A.2d 111 (1977); *Estate of Dunlap*, 471 Pa. 303, 370 A.2d 314 (1977); *Yohe v. Yohe*, 466 Pa. 405, 353 A.2d 417 (1976); *Shirley v. Clank*, 441 Pa. 508, 271 A.2d 868 (1970); *Flagiello v. Crilly*, 409 Pa. 389, 187 A.2d 289 (1963). We must, therefore, review the evidence to determine whether

the order entering judgment of compulsory nonsuit was proper.

■ The rule in Pennsylvania is that exculpatory provisions in a contract cannot be raised as a defense where (1) there is an affirmative or positive interference by the owner with the contractor's work, or (2) there is a failure on the part of the owner to act in some essential matter necessary to the prosecution of the work. *Gasparini Excavating Co. v. Pennsylvania Turnpike Commission,* 409 Pa. 465, 187 A.2d 157 (1963); *See Commonwealth of Pennsylvania, State Highway and Bridge Authority v. General Asphalt Paving Company,* 46 Pa.Cmwlth. 114, 405 A.2d 1138 (1979) (in spite of contract provisions excluding claims for additional compensation due to delay caused by the owner, contractor awarded additional compensation for three month delay caused by Commonwealth's direct interference in failing to have a water main expeditiously relocated), and *Commonwealth of Pennsylvania, Department of Highways v. S.J. Groves and Sons Co.,* 20 Pa.Cmwlth. 526, 343 A.2d 72 (1975) (exculpatory provisions of contract held not to prevent recovery by contractor of increased costs in performing due to a fourteen week delay while AT & T relocated a coaxial conduit). "[W]here an owner by an unwarranted positive act interferes with the execution of a contract, or where the owner unreasonably neglects to perform an essential element of the work in furtherance thereof, to the detriment of the contractor, [the owner] will be liable for damages resulting therefrom." *Henry Shenk Company v. Erie County,* 319 Pa. 100, 178 A. 662 (1935).

The trial court found that appellant failed to produce sufficient proof to justify the additional compensation sought. The court held that Coatesville proved neither an affirmative interference nor a failure to act in some essential matter and, therefore, the exculpatory provisions of the contract bar recovery. The Superior Court agreed with the lower court's conclusion and ruled that the evidence was

insufficient to invalidate the exculpatory language of the contract.[6] We disagree and now reverse.

█ The specifications in the bid documents and contract specifically stated that "the lake has been drained and shall remain in the drawdown condition until all silt and debris removal work has been completed." By this provision, the appellee had an obligation to maintain the lake bed in a drained and drawdown condition at the commencement of, and during the course of appellant's performance. When appellant submitted its bid both parties knew the lake was drained of water. Likewise, when the contract was awarded to appellant both appellant and appellee knew the lake was in a drained condition as set forth in the contract specifications. When, however, the appellant was notified by appellee to proceed with the contract work, the lake was not in the drained state as contemplated by the agreement. On the contrary, the lake was completely filled with water. This condition constituted an interference with the contract work required to be done by appellant. The appellant immediately notified appellee of the water condition and appellee's engineer led appellant to reasonably believe that the condition would be corrected. Ridley Park's notification to appellant to proceed with the excavation work when it was known that the lake was filled with water invalidated the exculpatory provisions of the contract. See *Gasparini, supra.* In *Gasparini* the contractor was awarded a contract for the construction of a portion of the northeastern extension of the Pennsylvania Turnpike. The contract specifically provided that during the time the contractor was performing its work thereunder, other contractors would be involved in slushing operation at the site. The contract also provided that: "No claims for damages or extra costs due to delay to the contractor's work caused by the work of slushing contracts will be allowed and it is agreed that the contract prices are submitted on this basis." On June 6, 1955, the contractor received official notice to proceed with its work. Under the agreement all of its work was to be

6. 339 Pa.Super 147, 488 A.2d 353 (1984).

completed by September 1, 1956. At the time the contractor was notified to start work, slushing operations were in progress on the job site. These slushing operations prevented the contractor from proceeding with its work. It was not until November, 1955 that the contractor was able to get on with its performance. In the contractor's claim for additional compensation alleged to be due because of the delay, we held that the exculpatory provisions apparently relieving the Commonwealth of any claim for extra costs were ineffective as a defense. We noted that the contractor was ordered to start work and prepared to do so by, among other things, moving equipment to the site. The work area, however, was not available to the contractor in that it was occupied by others engaged in slushing operations. The Superior Court distinguished *Gasparini* by pointing out that there the contractor was physically denied access to the work area by the presence of other contractors on the job site. In contrasting *Gasparini* to the instant case the Superior Court observed that Coatesville was never denied physical access to the work site. After receiving notice to commence, the appellant was able to and did put its workmen and equipment on the job site and immediately began work under the contract even though the lake was filled with water. Additionally, the Superior Court found significant that appellant did not invoke the protective procedure provided by the contract. Under certain circumstances Article IV, paragraph 2 (supra.) entitles the contractor to seek an extension of time for completing the job by submitting written notice to a committee of any work delay or hindrance resulting from causes entirely beyond the control of the contractor. Instead, the court concluded, appellant opted to forego an authorized extension of time and decided to commence work at its own risk. We believe the Superior Court was in error on both counts. In *Sheehan v. Pittsburgh*, 213 Pa. 133, 62 A. 642 (1905), this Court said:

Notwithstanding the breadth of the language of the agreement that all loss or damages from unforeseen obstructions and difficulties and from delay, were to be borne by the contractors, it is clear that the delay from

the city's failure to obtain complete right of way was not in the class of difficulties and delays which were in the minds of the parties, for the agreement itself was based on the assumption by both parties that the complete right of way had been secured so that the work could be begun at any point and proceed without interruption.

For the same reason the provision for extension of time only on written assent by the director of public works is not applicable.

There was therefore no breach of the agreement by the plaintiffs which prevented them from recovering, and the authorities are clear that *they were not bound to abandon the work or to be taken as having waived the delay* caused by the city. While they might have abandoned it they had the option to continue and claim the damages caused by the city's fault." (Emphasis added.)

Similarly, in the present case, the appellee's failure to have the lake in a drained 1:and drawdown condition when commencement of the work was ordered and to maintain that drained condition during prosecution of the work was not in the class of difficulties which were contemplated by the parties. It was a particular specification of the contract that the lake would be drained and kept in a drawdown condition until the appellant had removed the silt and debris. Additionally, the appellant was not bound to abandon the work or be deemed to have waived any delay caused by the appellee's failure to have the lake drained and ready for excavation as specified. Furthermore, at the time the appellant was ordered to commence work, the appellee was notified of the water in the lake. Appellant was led to reasonably believe that corrective measures would be taken by appellee to have the lake drained. Appellee never denied its responsibility to drain the lake and keep it drained. It was understood that keeping the lake drained was the responsibility of appellee and appellant's work began and continued on that basis.

In this case there was interference by the appellee in ordering appellant to start work without having the lake

drained and kept in a drawdown condition. Moreover, the evidence shows there was failure in the essential matter of the appellee not having the lake in a drained state when work was ordered to commence. The exculpatory provision of the contract cannot be raised as a defense to the appellant's claim for additional compensation occasioned by appellee's interference and failure to act in an essential matter as noted. The lower court erred in granting a compulsory nonsuit and continued its error in refusing to remove the nonsuit.

Accordingly, the order of the Superior Court is reversed and this case is remanded to the Court of Common Pleas of Delaware County for proceedings consistent with this opinion.