## Mosakowski v. Presque Isle Clinical Group Inc.

*Wayne G. Johnson* and *W. Gustave McGeorge,* for plaintiffs.

*Louis G. Long,* for defendants E.L. DiCola, D.O. and D.C. Carneval, D.O.

*Thomas M. Lent,* for defendant Metro Health Center.

JIULIANTE, *J.,* July 30, 1990 — This matter is before the court on plaintiffs' motion for post-trial

relief and defendants' motions for the denial of plaintiffs' motion for post-trial relief.

The trial judge entered a nonsuit in favor of defendant Metro Health Center, on October 28, 1987, at the close of plaintiffs' evidence. The jury returned a verdict in favor of the remaining defendants on October 29, 1987.

Defendants state that on November 6, 1987, plaintiffs filed a motion for post-trial relief and an ex parte motion for post-trial relief on November 13, 1987. On October 27, 1988, an order was entered compelling plaintiffs to file their brief in support of their motion on or before December 1, 1988. As of June 1989, plaintiffs had not filed a brief. Consequently, defendants requested entry of judgment in favor of defendants on the jury's verdict arguing that the court has sufficient information before it to rule on the post-trial motions without briefs.

After argument held on December 1, 1989, the parties agreed to a new briefing schedule rendering defendants' motions moot. However, the court will grant defendants' motions for denial of plaintiffs' motion for post-trial relief and deny plaintiffs' motion on the basis of the substantive arguments.

In their motion for post-trial relief, plaintiffs request judgment n.o.v. or, in the alternative, a new trial.

The issues presented by the post-trial motion are as follows:

(A) Whether the trial court erred in granting a compulsory nonsuit in favor of defendant Metro Health Center.

(B) Whether the trial court erred with regard to informed consent by:

(1) Excluding plaintiff's testimony as to whether he would have consented to either operation had he

been informed of the risks and alternate methods of treatment; and

(2) Not adequately charging on informed consent.

(C) Whether the trial court erred in refusing plaintiff's requested Pa.SSJI (Civ.) 10.07 on irrelevant considerations, and in precluding plaintiff's counsel from commenting thereon during closing arguments.

(D) Whether the trial court erred in refusing plaintiffs' requested point for charge no. 12. Proposed point for charge no. 12 reads as follows: "Where negligent conduct concurs with an act of nature, the defendant is liable unless he can show that the other cause would have produced the injury independent of defendant's negligence."

## STATEMENT OF THE CASE

On May 22, 1980, plaintiff Mr. Mosakowski, age 64, left his place of employment with the Erie School District and was on his way home when he hit rough pavement and was thrown off of his Honda moped. This occurred at approximately 4:30 p.m. He was taken by ambulance to defendant Metro Health Center and the next morning came under the care and treatment of defendant Dr. DiCola. Plaintiff suffered a compound, comminuted fracture of the right tibia and fibula. Later he came under the care and treatment of Dr. Carneval who performed surgical grafting of the leg in July 1980.

Plaintiff's fracture did not heal and his leg became severely infected. He subsequently required surgical care and treatment at the Cleveland Clinic under the auspices of Dr. Francis Boumphrey, a board-certified orthopedic surgeon.

Plaintiffs began this action to recover damages for the defendants' alleged negligence in treating Mr. Mosakowski's fracture. They alleged that Metro

Health Center was negligent in not promptly providing a qualified orthopedic surgeon to diagnose and treat plaintiff. Further Metro permitted a staff physician, Dr. DiCola, to perform an open reduction surgery with internal fixation, a procedure for which he allegedly did not have credentials or staff privileges.

Plaintiffs also allege that both physicians were negligent in the performance of their respective surgeries and in failing to obtain Mr. Mosakowski's informed consent for those surgeries. They further allege that Metro failed to obtain informed consents.

The court's rationale for granting the compulsory nonsuit was essentially based on the issue of causation. However, there was extensive discussion on the record relative to the issue of ostensible agency and the court, in referring to page 7 of defendant Metro's brief in support of nonsuit, determined that the lack of causation prevented the case against the hospital from going to the jury.

Defendants take issue with certain portions of the plaintiffs' statement of the case as set forth in their motion for post-trial relief. There will be reference to those disputed facts throughout this opinion.

## DISCUSSION

### (I) Compulsory Nonsuit, Ostensible Agency and Informed Consent Issues with Respect to Defendant Metro Health Center

Plaintiffs argue that the compulsory nonsuit was improper because there existed issues which the jury should have been allowed to determine. This, however, is not the standard. Our Supreme Court has held in the past:

"It has long been settled that a compulsory nonsuit can only be granted in cases where it is clear that a cause of action has not been established. The

plaintiff must be given the benefit of all favorable evidence, along with all reasonable inferences of fact arising from that evidence. Any conflict in the evidence must be resolved in favor of the plaintiff. We must, therefore, review the evidence to determine whether the order entering the judgment of compulsory nonsuit was proper." *Coatesville Contractors v. Borough of Ridley,* 509 Pa. 553, 559-60, 506 A.2d 862, 865 (1986). (citations omitted)

In performing its duty to review the evidence presented, our Supreme Court has also stated that the court should grant a nonsuit "at the close of plaintiff's case only when it is clear that the plaintiff has not presented sufficient evidence to maintain the action." *Estate of Dunlap,* 471 Pa. 303, 370 A.2d 314 (1977).

Plaintiffs allege they presented sufficient evidence by which the jury could have determined liability on the part of the hospital on theories of ostensible agency, corporate liability and failure to obtain informed consent. For the following reasons, plaintiffs have simply failed to provide evidence of a causal connection between any of the alleged theories of recovery and plaintiffs' harm, thereby failing to state a cause of action against defendant Metro.

Plaintiffs are correct in their assertion that *Thompson v. Nason Hospital,* 370 Pa. Super. 115, 535 A.2d 1177 (1988), is the most recent appellate case on the theory of ostensible agency. *Thompson* relied on earlier cases, most notable *Simmons v. St. Clair Memorial Hospital,* 332 Pa. Super. 444, 481 A.2d 870 (1984).

In *Simmons,* the court pointed out that the ostensible agency theory in Pennsylvania is based on section 429 of the Restatement (Second) of Torts and binds a principal for the acts of an independent contractor under certain circumstances. *Id.* at 452,

481 A.2d at 874. In determining whether ostensible liability attaches, the *Simmons* court stated the following:

"Two factors relevant to a finding of ostensible agency are: (1) whether the patient looks to the institution, rather than the individual physician for care; and (2) whether the hospital 'holds out' the physician as its employee." *Id.*

In applying these factors in *Simmons,* the court concluded that a jury issue existed as to whether a particular physician, Dr. Wright, was an ostensible agent of St. Clair Memorial Hospital. The decedent in *Simmons* was admitted to the emergency room following a suicide attempt. At the time of his admission to St. Clair, Dr. Wright was the "on call" emergency physician. Testimony at trial indicated that it was hospital personnel that contacted Dr. Wright to see the decedent in the emergency room and, in fact, it was Dr. Wright who admitted the decedent to the psychiatric unit.

There was additional testimony in *Simmons* that at the time the decedent was admitted to the hospital, it was represented that he was the head of the psychiatry department at the hospital and that he was "qualified." The decedent was admitted on a later occasion under Dr. Wright's service and was seen and treated by him.

Under the above circumstances, the court found that the jury could have concluded that decedent looked to the hospital for care and that the hospital held out the doctor as its employee.

In this case, however, we have none of those factors in *Simmons* in support of plaintiffs' motion for the granting of a new trial on the ostensible agency. Initially, although plaintiffs argue in their brief that Mr. Mosakowski did not choose the facility, there was no testimony whatsoever as to why

plaintiff was taken to Metro. It may have simply been the closest hospital or because his family doctor had admitting privileges there. We simply do not know why he was taken there. We do know, however, that his personal family physician had admitting privileges at Metro.

It is admitted that subsequent to Mr. Mosakowski's admission to the hospital, Dr. DiCola performed an open reduction with internal fixation. Neither plaintiff is aware of how Dr. DiCola became involved in Mr. Mosakowski's treatment, however, as Mrs. Mosakowski's testimony clearly sets out, they looked to Dr. Kalata, their personal physician, to see that Mr. Mosakowski received the appropriate care.

Dr. DiCola's testimony indicates that he was called by Dr. Kalata to look at Mr. Mosakowski at about 6 a.m., the morning after his admission. This consult was requested by plaintiffs' doctor after he was called at plaintiffs' request.

With regard to the second element required in a finding of ostensible agency, there is simply no testimony of record that Metro held out Dr. DiCola as an employee of the hospital. He was present only by virtue of a request made by plaintiffs' own personal physician who was present at the hospital and in charge of plaintiff's care due to his own request. Arguably, had emergency room personnel told Mr. Mosakowski, "We will get Dr. DiCola here, he is our orthopedic surgeon that will take care of this problem," there might be an argument that Dr. DiCola was held out by the hospital as an employee. However, there is no evidence whatsoever that any discussion or representation of the kind was made. In fact, neither plaintiff knows how Dr. DiCola came to be involved in Mr. Mosakows-

ki's treatment. The following testimony is relevant on this particular point:

Q: Was it Dr. Kalata who called in Dr. DiCola?

A: I don't know who called him. I know the hospital was trying to find —

Q: Okay. You don't know whether it was Dr. Kalata's idea to have Dr. DiCola?

A: No; I don't know who they got. I don't know who found him.

Mr. Mosakowski's testimony is devoid of any information relative as to how Dr. DiCola was obtained to treat his fracture.

Quite clearly, none of the ostensible agency factors relied on by the *Simmons* court are present in the immediate case.

Dr. Kalata's presence in the emergency room was at the behest of plaintiffs. Mr. Mosakowski was admitted under Dr. Kalata's service and it was Dr. Kalata who ordered diagnostic tests and, in fact, Dr. Kalata who called in the orthopedic surgeon, Dr. DiCola. The only testimony which has bearing on the question of whom plaintiffs considered as providing health care to Mr. Mosakowski, conclusively establishes that the Mosakowskis were looking to Dr. Kalata and not Metro Health Center. Further, the only testimony on Dr. Kalata's employment status is that of Mrs. Mosakowski who states that she did not believe that Dr. Kalata was an employee of Metro.

There is simply no testimony that Metro Health Center held out either Dr. DiCola or Dr. Carneval as an employee and it is clear by virtue of plaintiffs' request, that Dr. Kalata, clearly, not an employee, was called in to take charge of Mr. Mosakowski's treatment.

Giving plaintiffs every reasonable inference possible, there is simply no evidence sufficient to set

out a cause of action establishing that either Dr. DiCola or Dr. Carneval were ostensible agents of Metro Health Center and this court's granting the nonsuit of defendant Metro Health Center is clearly supported by the record.

Further, on the issue of causation, it appears that following the conclusion of the trial, the jury found in favor of both defendants which finding at least implies that the jury did not believe either defendant, Dr. DiCola or Dr. Carneval, was negligent and, as such, even if the court were to find sufficient evidence of ostensible agency, same would be of no effect insofar as the jury did not find any negligence on the part of the ostensible agents.

Plaintiffs argue in their brief that despite the lack of an agency relationship, a hospital can be held liable where there is independent negligence in failing to supervise the quality and care being rendered by its staff where the hospital has actual or constructive knowledge of procedures utilized and where the hospital's failure to monitor the care being provided at the hospital is a substantial factor in bringing about the harm alleged by plaintiff. This particular theory has never been recognized by the Pennsylvania Supreme Court; however, there is some authority for this theory in *Thompson v. Nason Hospital, supra.*

The *Thompson* court discussed this theory of "corporate liability" as "holding the hospital responsible where it failed to monitor and review medical services being provided within its facilities."

Further delineating its understanding of this theory, the Superior Court stated the following:

"However, we deem it important to point out that for a hospital to be charged with negligence for failing to supervise the quality of care or compe-

tence of its staff, it is necessary to show that the hospital had actual or constructive knowledge of the procedures utilized. Moreover, the negligence of the hospital must have been a substantial factor in bringing about the harm to plaintiff." *Id.* (citations omitted)

The lower court in *Thompson* granted summary judgment in favor of the defendant and apparently did not address the appellant's argument with regard to this particular theory and pointed out that "until today, this theory of liability was not recognized in Pennsylvania." *Id.*

Although there is some support for this particular theory in Pennsylvania, plaintiffs misconstrue same. Borrowing from the theory of ostensible agency (which is recognized by *Thompson* as a separate theory), plaintiffs argue that once plaintiff was admitted to the Metro emergency room, he "looked to Metro to afford care within the acceptable standard, including the providing of a trained and qualified physician specialist." (Plaintiffs' brief at 5.) Initially, there is no testimony supporting the assertion that plaintiff was looking for the provision of "a trained and qualified physician specialist," but further, there is no support for plaintiffs' argument that Metro had a duty to "obtain an orthopedic surgeon to perform an emergency debridement." This simply is not a proper reading of the facts in this case, nor is it a proper application of the theory of corporate liability as espoused in *Thompson.*

Plaintiffs' reading of *Thompson* would essentially hold that if the doctors involved in a particular patient's case do not select or employ the proper medical treatment, that the hospital is responsible if the patient looked to the hospital for the provision of the appropriate care. This is simply not the case. Corporate liability, as stated in *Thompson,* applies

where a hospital is aware, either actually or constructively, that its staff is providing substandard care or rendering care in an incompetent manner and performing certain procedures and .the hospital is simply negligent in supervising the quality of said care and allowing these procedures to continue. Essentially, the hospital has a duty to supervise its staff to insure that the proper standards of care and competence are maintained. It does not become responsible on a particular occasion because there are allegations that a particular procedure was performed in a negligent manner. This is exactly the manner in which plaintiffs are attempting to have this theory construed and applied in the immediate case.

This argument of corporate liability is, however, applicable to plaintiffs' allegation that Dr. DiCola did not have privileges to perform an open reduction with internal fixation. However, plaintiffs offered absolutely no proof that Dr. DiCola's failure to maintain this particular privilege had any causal connection with plaintiffs' alleged harm. Initially there was no testimony that anyone from Metro was aware that Dr. DiCola was going to perform an open reduction with internal fixation on Mr. Mosakowski. Secondly, there is no allegation that Dr. DiCola was unqualified in any manner to perform this particular surgery. There is simply no evidence as to why Dr. DiCola no longer had the privilege of performing an open reduction with internal fixation. Without such testimony, plaintiff has completely failed on his causation proof and, as such, the hospital cannot be held liable simply because plaintiffs would like the jury to speculate that perhaps Dr. DiCola's privileges were taken away when, in fact, he simply may not have applied for the additional privilege of performing this type of procedure.

Although there are no Pennsylvania cases directly on point, the Illinois appellate court dealt with a similar situation and held that in order to find liability against a hospital under a fact situation similar to that directly at hand, there must be some knowledge by the hospital prior to the procedure that would indicate the hospital should have known a physician was unqualified. This is similar to the requirement of *Thompson* that "it is necessary to show that the hospital had actual or constructive knowledge of the procedures utilized." Specifically, the Illinois court stated:

"The two specific allegations of deviation from hospital policy, that is, the failure to administer muscle relaxant and the failure to conduct a physical examination, do not support the contention that the hospital breached its duty of due care to plaintiff. The failure of the hospital to follow its policy can be evidence of a breach of the hospital's duty to patient, but the procedures specified in the complaint are matters within the duty of due care owed by the treating physician, not the hospital. As we stated above, there was no allegation that the hospital knew or should have known that the physician would ignore this policy." *Pickle v. Curns,* 106 Ill. App. 3d 734, 435 N.E.2d 877, 822. (citations omitted)

In the *Curns* case, it was apparent that the doctor actually failed to adhere to hospital rules in performing a procedure for which he did not have privileges. As there was no evidence in the *Curns* case that the hospital knew or should have known that the doctor would disregard hospital policy, there was no liability against the hospital.

In the immediate case, plaintiffs have produced no evidence that the hospital knew or should have known that its policy would be ignored. The policy

the Illinois court was dealing with pertained directly to specific treatment which was to be administered in specific situations. In the immediate case, we are not dealing with such a policy because the hospital policy on privileges merely relates to the contract between the doctor and the hospital as to what procedures may be performed in the hospital. There is no evidence of record that Dr. DiCola did not have privileges to perform open reductions based on his inability to perform these procedures. Therefore, plaintiff is arguing strictly that because Dr. DiCola did not have the technical privilege to perform this operation, that his performance of same should impose liability on the hospital. This runs counter to case law dealing directly with the subject and runs counter to the requisite elements which must be shown according to *Thompson.*

Although the failure to follow hospital bylaws may be some evidence of negligence, the failure to follow hospital bylaws and regulations does not establish negligence. Liability cannot be imposed upon a hospital absent some proof that the violation was the cause of the plaintiff's injury. This is in keeping with the theory in *Thompson* that the negligence of the hospital must have been a substantial factor in bringing about the harm to the plaintiff.

Under the corporate liability theory set forth in *Thompson,* plaintiffs did not provide sufficient evidence, with all reasonable inferences therefrom, to support a cause of action relative to corporate liability.

Plaintiffs additionally argue that because Metro did not obtain an orthopedic surgeon to perform an emergency debridement, a jury could have found that this was negligence and, further, that this negligence caused plaintiffs' harm. Initially, it is important to note that plaintiffs' own expert, Dr.

Boumphrey, testified that even had the treatment obtained by Mr. Mosakowski been 100-percent compliant with what he felt to be proper treatment, the same result could have befallen plaintiff because these are simply difficult fractures to treat.

With regard to the alleged necessity of an emergency debridement, it is important to note that Dr. Boumphrey testified that debridement is a surgical procedure which is done under anesthesia. He also testified that in treating a patient such as plaintiff, the emergency room function is to get a doctor who is competent to carry out this procedure.

There is, however, no testimony of record that Dr. Kalata was not competent to carry out the surgical debridement. Further, Dr. Boumphrey could not find any indication in the record as to when the debridement was performed.

There is simply no statement in the record as to when the debridement was performed and Dr. Boumphrey simply assumed that it was done at the time of surgery. Further, there is no testimony that Dr. Kalata did not perform a debridement of some sort, nor is there any testimony as to whether Dr. Kalata was competent to perform such a procedure. If, in fact, he was competent, then even under plaintiffs' argument, the hospital would have adhered to its duty and would bear no liability.

With regard to whether the hospital should bear liability because the emergency room personnel may not have obtained "an orthopedic surgeon to perform an emergency debridement," Dr. Boumphrey states that the treatment which should be performed on any patient is not a decision to be made by the hospital but is to be made by the physician.

It was not up to Metro to make a determination as to what type of treatment was needed for Mr. Mosakowski and then make sure that the doctor

performed the same. Once the hospital contacted Dr. Kalata and he was on the scene, as Mrs. Mosakowski states, he was in charge of the case and plaintiffs looked to him to provide adequate care and obtain the necessary consultations. Dr. Kalata did what was necessary and, in fact, it would have been his judgment as to what he believed was necessary and what type of consults were required.

This argument that plaintiff looked to Metro to provide a certain surgical procedure is completely unsupported. For the foregoing reasons this court will not reverse its decision to grant a nonsuit in favor of defendant Metro Health Center.

### (II) *Informed Consent and Trial Court Error Issues with Respect to Defendants Dr. DiCola and Dr. Carneval*

Plaintiffs contend that the trial court erred with respect to the issue of informed consent by excluding the plaintiffs' testimony as to whether he would have consented to either operation had he been informed of the risks and alternate methods of treatment and by not adequately charging on informed consent.

Defendants argue that the court properly precluded Mr. Mosakowski from testifying whether he would have submitted to the operative procedures if he had been told of the risks and alternatives and that this issue has been waived. After defense counsel objected to the question, the court sustained the objection with leave to rephrase the question. Plaintiffs' counsel did not avail himself of that opportunity to cure the objection. The issue came up again in chambers. The court reiterated that the question, if properly phrased, could be asked. However, plaintiffs' counsel never broached the subject. This is similar to *Capan v. Divine Providence Hos-*

*pital,* 270. Pa. Super. 127, 410 A.2d 1282 (1979), which held that counsel waived an issue when he withdrew a question to which an opponent's objection. had been sustained.

The court agrees with defendants' position that this issue has been waived. However, even if there were no waiver, no reversible error occurred inasmuch as the plaintiff's answer was not probative of any fact material to the informed consent issue. Evidence is relevant if it tends to prove or disprove a material fact. *Reichman v. Wallach,* 306 Pa. Super. 177, 452 A.2d 501 (1982).

Plaintiffs did not present sufficient evidence of a material fact. Plaintiffs must show that the physicians failed to make adequate disclosures prior to the execution of the consent form. The doctors testified about the discussions they had with Mr. Mosakowski. Mr. Mosakowski, on the other hand, could not recall the substance of the discussions. Mrs. Mosakowski likewise had no recall. The jury could not reasonably infer that the doctors failed to disclose any particular fact from his inability to recall. See *Mele. v. All Star Insurance Co.,* 453 F.Supp. 1338, 1342 (E.D. Pa. 1978) ("A reasonable inference is one not based on speculation or conjecture but rather is a logical consequence deduced from other proven facts.") As such, any error on the informed consent issue was harmless.

*Cooper v. Roberts,* 220 Pa. Super. 260, 286 A.2d 647 (1971), held that a physician must disclose all the facts, risks and alternatives which a reasonable man would consider material to the decision to undergo or forego treatment. Subsequent cases have labelled this as the prudent patient standard. See, e.g., *Festa v. Greenberg,* 354 Pa. Super. 346, 352-3, 511 A.2d 1371, 1374-5 (1986). *Sagala v. Tavares,* 367 Pa. Super. 573, 533 A.2d 165 (1987); and *Gouse v.*

*Cassel,* 385 Pa. Super. 521, 561 A.2d 797 (1989), confirm that the prudent patient standard is an objective one, and not a subjective one.

In *Sagala,* the trial judge submitted special interrogatories to the jury. One question required the jury to decide whether the patient would have submitted to the operation if the risk of embolism had been disclosed. That question read:

" 'If you find the risk of pulmonary embolism was one in [sic] which a reasonable man in the position of Steven J. Sagala would consider material to his decision whether or not to undergo treatment would the reasonable man in the position of Steven Sagal[a] have consented to the surgery despite disclosures of that risk?' And, again, the answers are yes or no, and if your answer is yes, you must find for the defendant. If your answer is no, you must find for the plaintiff." 367 Pa. Super. at 580, 533 A.2d at 168.

Although the Superior Court's decision does not state how the jury answered this, or any other question posed by the trial judge, the jury did return a verdict for the physician. On appeal, plaintiff argued, inter alia, that the jury instructions — including the interrogatory — misstated the law of informed consent. The Superior Court agreed. *Id.* at 580, 533 A.2d at 168. The Superior Court noted that Pennsylvania follows the prudent patient standard. *Id.* at 580, 533 A.2d at 168. However, the Superior Court added that it was error to pose an interrogatory to determine whether the patient would have consented if a full disclosure had been made.

Thus, *Sagala* supports the defense position because it shows that the jury may not consider whether the patient would have acted differently if all the pertinent facts had been disclosed to him.

This interpretation of the law has been confirmed in *Gouse, supra.*

In *Gouse,* the jury was required to decide whether the patient had been told all the material facts, risks, complications and alternatives which a reasonable man would have considered to be significant and if so, whether he still would have submitted to the operation.

The jury answered the first question in the negative — indicating that full disclosure had not been made — and the second in the affirmative — indicating that the patient would have consented anyway. Based on those answers, the trial judge entered judgment for the doctor. On appeal, the patient attacked the second interrogatory as unnecessary. Also, he argued for a subjective rather than an objective standard of causation. The Superior Court agreed that second interrogatory should not have been given. *Id.* at 523, 561 A.2d at 799. The court refused, however, to deviate from the objective standard articulated in *Sagala.*

While *Sagala* and *Gouse* did not address the evidentiary issue presented in this case, they are instructive nevertheless. Those cases involved the propriety of jury instructions and, more importantly, the framing of the issues to be decided by the jury in an informed consent case. Based upon *Sagala* and *Gouse,* the jury cannot consider whether the patient, if fully informed, would still consent to the surgery. Therefore, evidence tending to show whether plaintiff would have submitted after full disclosure is not relevant. Accordingly, plaintiffs are not entitled to a new trial on this basis.

Plaintiffs contend that the court erred in charging the jury concerning how an emergency situation or the adverse effect on the therapeutic process bear upon the informed consent doctrine. In addition to

substantive argument, defendants argue that plaintiffs have waived this issue inasmuch as they did not object to that aspect of the charge as given. The court agrees that this issue has been waived. Furthermore, the objections now pursued were not advanced when, during the trial, the court announced its intention to charge on these particular matters. Thus the issue is not preserved. Pa.R.A.P. 302(b); *Crosbie v. Westinghouse Elevator Co.,* 297 Pa. Super. 304, 443 A.2d 849 (1982). Even if timely objections were made at trial, the instructional issue was not raised in post-trial motions, as required by Pa.R.C.P. 227.1(b)(2). The argument contained in their brief is not sufficient to resurrect the issue. See *Cherry v. Willer,* 317 Pa. Super. 58, 463 A.2d 1082 (1983).

Substantively, however, the court's comments were necessary to give the jury an entire statement of the law on informed consent. The charge, which will not be repeated here, was full and complete and comported with applicable law.

When considering the adequacy of jury instructions, a reviewing court must consider the entire charge and its general effect controls. See, e.g., *Commonwealth v. Hawkins,* 295 Pa. Super. 429, 441 A.2d 1308 (1982). It is the court's duty, when charging the jury, to give a complete statement of applicable law. See, e.g., 1 S. Feldman, Pennsylvania Trial Guide §121.1 (2d ed. 1987). Moreover, the court must be careful not to mislead the jury. *Id.*

The portion of the charge to which an objection is now made comes from Pa. SSJI (Civ.) §10.06A. Plaintiffs do not attack any portion of that charge as being an incorrect statement of the law. Indeed, they could not credibly do so in light of section 103 of the Health Care Services Malpractice Act, 40 P.S. §1301.103 (definition of informed consent). See

also, *Dunham v. Wright,* 423 F.2d 940 (3d Cir. 1970); *Malloy v. Shenahan,* 280 Pa. Super. 440, 421 A.2d 803 (1980). The additional instructions were necessary to inform the jury fully of the law of informed consent and to dispel any notion that a physician must make a disclosure under all conditions.

Instead, plaintiffs argue that the charge was misleading and confusing. Plaintiffs' argument has taken the charge out of context and they have not considered the charge as a whole. Moreover, the charge gave the jurors various alternatives to assist them in deliberations, just as in subparagraph I of Pa.SSJI (Civ.) §10.06A. There was no evidence of any confusion on the part of the jurors. Thus, under the circumstances, the charge does not require the granting of a new trial. Plaintiffs contend that the court erred in failing to charge the jury regarding allegedly irrelevant considerations. The plaintiffs had requested an instruction found in Pa.SSJI (Civ.) §10.07 which addressed the fact that a physician's license to practice or his insurance coverage could be jeopardized by a verdict rendered against him.

Defendants again argue that this issue has been waived. We agree. Plaintiffs never asked for the requested charge and never objected to the court's ultimate decision not to give the disputed instruction. The record shows that the court first raised the issue. When the court later reconsidered the defense objection, plaintiffs never excepted to the ruling. Moreover, plaintiffs never objected at the conclusion of the charge. Thus, the issue was not preserved for appeal. See Pa.R.A.P. 302(b); *Crosbie, supra.*

Be that as it may, the court is still of the opinion that it properly declined to give that instruction. The suggested charge is not approved by the Supreme

Court of Pennsylvania. See 1 S. Feldman, Pennsylvania Trial Guide, §12.20 (2d ed. 1987).

A physician's license can be revoked or suspended for unprofessional conduct. Osteopathic Medical Practice Act, 63 P.S. §271.15 (a)(8). See also, Medical Practice Act of 1985, 63 P.S. §422.41(8)(ii). Unprofessional conduct is defined by those statutes to include any failure to conform to the standards of acceptable and prevailing practice. 63 P.S. §§271.15(a)(8), 422.41(8)(ii). While it is true that a physician's license is not automatically suspended by virtue of an adverse malpractice verdict, the simple fact remains that the appropriate licensing body may use an adverse verdict to initiate an investigation against the physician. Health Care Service Malpractice Act, 40 P.S. §1301.901.

While there is a genuine threat to a physician's license following an adverse verdict, a mere claim against him could also have a deleterious effect. Under 31 Pa. Code §242.11, a health care insurer must notify the director of the Medical Professional Liability Catastrophe Loss Fund (CAT Fund) of claims, not verdicts, that are likely to exceed a health care provider's coverage. The director of the CAT Fund then can make a surcharge or an emergency surcharge in order to maintain the financial integrity of the CAT Fund. The doctor must pay this surcharge or penalties may be imposed upon him. He could lose his CAT Fund coverage or his license. 31 Pa. Code §242.17(a),(b). Because a mere claim against a physician could jeopardize his license or insurance coverage, the court was correct in declining to read Pa.SSJI (Civ.) §10.07 to the jury.

Contrary to plaintiffs' argument, the jury was not told to consider how the case could harm the doctors' reputations. While a jury instruction or a closing argument raising such a point would proba-

bly be wrong, there was no such instruction given nor was there any such objectionable argument made. 74 ALR 2d 662 (1960). It does not logically follow that a jury should be told to disregard the impact of its verdict upon the defendant. No cases were cited by the parties for the proposition that the jury should be told to ignore the effect of its verdict on the defendant.

Thus, in the face of articulable harm to defendant doctors, the court was correct in refusing to instruct on the allegedly irrelevant considerations per Pa.SSJI (Civ.) §10.07.

Finally plaintiffs argue that the jury instructions on causation were inadequate. The court's basic charge on causation was as follows:

"Now, the defendant physician — and I'm talking about legal cause now — is legally responsible or liable for the injuries suffered by his patient if the defendants' negligent conduct is a legal cause of those injuries.

"In order for the negligent conduct to be a legal cause, that conduct must have been a substantial factor in bringing about the injuries in question.

"If the injuries in question would have been sustained even if the physician had not been negligent, then the negligent conduct of the defendant physician, if you so find that he was negligent, would not be a substantial factor in causing the injuries in question.

"So, to put it in another manner, the negligent conduct of the defendant is a substantial factor in causing his patient's injuries if those injuries would not have been sustained had the physician not acted in a negligent manner.

"Now, when a defendant physician negligently fails to act, or negligently delays in employing indicated diagnostic or therapeutic measures, and

his negligence is a substantial contributing factor in causing injuries to his patient, the plaintiff does not have to prove to a certainty that proper care would have, as a medical fact, prevented the injuries in question. If a defendant physician's negligent action or inaction had effectively terminated his patient's chances of avoiding injuries, he may not raise conjectures as to the measures — as to the measure of chances that he has put beyond the possibility of avoiding injuries and the defendant has destroyed that possibility, he is liable to the plaintiff.

"A causal connection between the injuries suffered and the defendant's failure to exercise reasonable care may be proved by evidence that the risk of incurring those injuries was increased by the defendant's negligent conduct."

Later the court added:

"Now, one other matter that I'm going to charge you on and then we'll get into the final instructions. The plaintiff is entitled to recover damages for all injuries which the defendant's negligence was a substantial factor in producing. The defendant's negligence need not be the sole cause of the injuries. Other causes may have contributed to producing the final result. The fact that some other factor may have been a contributing cause of an injury does not relieve a defendant of liability unless you find that such other cause would have produced the injury complained of independently of the negligence."

The basic charge is virtually identical to Pa.SSJI (Civ.) §§10.03, 10.03B. The recommended charge is based on *Hamil v. Bashlin,* 481 Pa. 256, 392 A.2d 1280 (1978); and *Gradel v. Inouya,* 491 Pa. 534, 421 A.2d 674 (1980).

The supplemental charge, dealing with the effect of other causes, is virtually identical to the charge approved by the Supreme Court in *Gradel* and by

the Superior Court in *Kearns v. Clark,* 343 Pa. Super. 30, 493 A.2d 1358 (1985). There was no error.

The plaintiffs' only particular challenge to the causation instruction was that the charge did not differentiate between acts of third parties and forces of nature. Such a distinction, however, was not necessary. The basic charge was neutral as to the source of the other causes which the jury could consider. The charge in *Gradel* — which involved the occurrence of cancer, another natural force — was similarly neutral in its description of the other causes that could exist along with defendant's causal responsibility. There is simply no reason for the court to particularize the charge when the general charge is sufficient to put the issue before the jury.

This court feels that the charge on causation was proper and no prejudice resulted from the failure to grant plaintiffs' requested point for charge. The post-trial motion therefore will be denied.

## ORDER

And now, July 30, 1990, for the reasons stated in the opinion filed even date herewith, it is hereby ordered, adjudged, and decreed that plaintiffs' motion for post-trial relief is hereby denied.